993 F.2d 1548
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Jack L. WALLS, Personal Representative of the Estate of
Frank E. Walls, deceased, Plaintiff-Appellant,
v.
The CITY OF DETROIT, a Municipal corporation; the Detroit
Police Department; William L. Hart, in his former capacity
as Chief of Police for the City of Detroit Police
Department; Executive Deputy Chief, James Bannon; Deputy
Chief, James Younger, Defendants-Appellees,
and
Second Chance, Inc., a Michigan corporation; and John Doe
Corporation # 1; jointly and severally, Defendants.
 No. 92-1846.
 United States Court of Appeals, Sixth Circuit.
 May 14, 1993.
 
 Before GUY and NELSON, Circuit Judges, and SPIEGEL, District Judge.*
 PER CURIAM.
 
 
 1
 Plaintiff, Jack Walls, appeals summary judgment for the defendants in this 42 U.S.C. § 1983 action brought on behalf of a Detroit police officer shot and killed while on duty by a barricaded gunman. The district court held that plaintiff had failed to state a claim upon which relief could be granted. Plaintiff challenges that conclusion on appeal. He contends that defendants acted with deliberate indifference to the officer's constitutional rights when they ordered the officer to storm the gunman's apartment rather than waiting him out. Plaintiff also raises several alleged procedural infirmities with the proceedings below. Finding all of the plaintiff's substantive and procedural arguments meritless, we affirm.
 
 I.
 
 2
 In the early morning hours of October 17, 1988, Charles Knowles was seen pouring gasoline in his apartment building and threatening the tenants with a gun. Police responded to the scene at approximately 7:40 a.m., where they saw Knowles armed with a high-powered rifle and muttering incoherently to himself. It was later confirmed that Knowles had a history of mental illness and suffered from paranoid schizophrenia.
 
 
 3
 An experienced police negotiator, Sergeant Victor Hess, was called to the scene to talk with Knowles after he barricaded himself in his apartment. Hess observed Knowles through a four- to six-inch opening in the apartment door held by a safety chain, and Hess also noticed a rifle and a one-gallon can in the apartment. Knowles continued to talk incoherently and spoke of people attacking him. Nevertheless, Hess continued his attempted dialogue with Knowles while simultaneously trying to open the apartment door wider. At one point, Hess attempted to cut the safety chain with bolt cutters, but Knowles told him not to cut the chain and instead unlocked the door. Hess and other officers then managed to push the door open 16-20 inches. Suddenly and without warning, as Hess continued to talk to Knowles, another officer ran past Hess and other officers in an apparent attempt to force the door. Knowles, who until then had the rifle pointed in a downward position, shot and killed the rushing officer.
 
 
 4
 The officers retreated, evacuated the building, and sealed off the neighborhood. They persisted in attempting to communicate with Knowles, offering him food, cigarettes, liquor, and a minister. Family members and neighbors also attempted to persuade Knowles to surrender, though one of Knowles' daughters refused to speak to him for fear he would kill her. All of these efforts were in vain. A psychiatrist who had treated Knowles for his mental illness also declined to come to the scene to talk with Knowles because he considered it "pointless" to do so.
 
 
 5
 Executive Chief Deputy James Bannon and Deputy Chief James Younger arrived on the scene early in the stand-off. After a briefing on what had occurred, Bannon placed Deputy Chief Younger in command. As the situation stretched into the afternoon, Bannon directed Younger to develop a plan to go in and get Knowles. Several factors contributed to this decision: Knowles was not communicating at all with the officers and did not exhibit any signs of rational thought; children were beginning to leave school and attempting to enter the apartment building; a crowd of onlookers and residents of the evacuated block had congregated and become disorderly and verbally abusive to police officers; manpower was stretched to its limits; the police were unable to verify if Knowles possessed gasoline; and Knowles possessed a high velocity rifle that could penetrate walls, thereby putting officers and the public at risk.
 
 
 6
 Younger ordered the Special Response Team (SRT), to formulate a plan to enter the apartment and apprehend Knowles. The decedent, Frank Walls, was a member of the SRT. At approximately 2:00 p.m., the SRT put its plan into action. Initially, it used tear gas and stun monitors hoping either to weaken Knowles before the SRT's entry or to cause Knowles to surrender. When Knowles did not surrender, the SRT prepared to enter. Walls, the first entry man, had a protective shield in front of him. He knocked the door down by hitting it two to three times with the shield, waited for a moment, then entered. With other officers right behind him, Walls advanced down the hall. Knowles was to his right and fired a shot that killed Walls. The other officers returned the fire, killing Knowles.
 
 
 7
 In 1991, plaintiff, the personal representative of the estate of Frank Walls, filed an eight-count complaint in state court. The suit included a § 1983 cause of action against the City of Detroit; the Detroit Police Department; former Chief of Police William Hart, in his official capacity; Executive Deputy Chief Bannon, in his individual and official capacities; and Deputy Chief James Younger, in his individual and official capacities. The suit also included a claim under Michigan's wrongful death statute and a products liability claim against the makers of the protective shield that Walls used in entering the apartment. When the defendants failed to answer the complaint within the applicable time period provided by Michigan law, plaintiff noticed their defaults in state court.
 
 
 8
 On the same day, January 9, 1992, the defendants removed the case to federal court pursuant to 28 U.S.C. §§ 1441 and 1443(2). Plaintiff then filed a request for default against the City of Detroit and Hart--the only defendants that plaintiff had served at that point--for failure to file an answer or other responsive pleadings, and the default was entered against them on February 2. Defendant Younger was also served in January, and on February 11 a default was filed against him. The clerk entered the default the next day.
 
 
 9
 Throughout January and early February, attorneys for the plaintiff and the defendants discussed a stipulation that would set aside the defaults. According to the plaintiff, the communications involved only a discussion of the proposed stipulation, which was to include an agreement that the defendants would preserve all evidence. According to the defendants, their exchanges with plaintiff's counsel included notifying counsel that defendants would file a summary judgment motion because they believed that workers' compensation was the only available remedy. The parties eventually agreed to stipulate to set aside the defaults and preserve the evidence. In the interim, however, defendants filed a motion to set aside default and a motion for summary judgment. They served a copy of the motions on plaintiff's counsel, and the documents were received on February 24. Plaintiff did not respond to either motion, and he later charged that the defendants' summary judgment motion was "hidden" in the packet of documents his counsel received on February 24. Then, on March 31, the district court granted defendants' motion to set aside default, and subsequently granted their motion for summary judgment on the § 1983 claim. Relying on Collins v. City of Harker Heights, --- U.S. ----, 112 S.Ct. 1061 (1992), the court determined that plaintiff failed to state a claim.[1] The court then declined pendent jurisdiction and remanded the case to state court for consideration of plaintiff's state law claims. Plaintiff moved for reconsideration, which the court denied.
 
 II.
 
 10
 Plaintiff argues that the district court committed three procedural errors in handling defendants' summary judgment motion, thereby requiring a reversal of the grant of summary judgment. First, plaintiff maintains that the defendants' default status precluded them from moving for summary judgment. Second, plaintiff contends that defendants violated local rules by failing to seek plaintiff's concurrence when moving for summary judgment. Third, plaintiff argues that he did not receive the requisite ten-day notice before summary judgment was granted in favor of defendants.
 
 
 11
 The trial court considered these arguments when plaintiff moved for reconsideration of the court's decision to grant summary judgment on the § 1983 claim. In response to the contention that defendants lacked standing because of their default status, the court concluded that it had granted defendants' motion to set aside the default prior to considering the motion for summary judgment. Thus, the defendants were not in default when the summary judgment motion was examined. Although the court had trouble with defendants' seeming violation of local rules, it held that their infraction did not result in a "palpable defect" which would require reconsideration. Finally, the court found that plaintiff's lack of response to the motion was created entirely by his own failure to notice the summary judgment motion sent to him. Our review of the record confirms that the trial court properly resolved the alleged procedural errors.
 
 
 12
 An entry of default against a defendant pursuant to Federal Rule of Civil Procedure 55 is largely a formal matter. See Connecticut Nat'l Mortgage Co. v. Brandstatter, 897 F.2d 883, 885 (7th Cir.1990) (entry of default "normally is entered by the clerk of court automatically upon the failure to file a timely pleading"); 6 Moore's Federal Practice § 55.03(2) (1993). It must be distinguished from a judgment by default, because "relief from a default judgment requires a stronger showing of excuse than relief from a mere default order." Connecticut Nat'l Mortgage Co., 897 F.2d at 885 (citations omitted).
 
 
 13
 Plaintiff attempts to attach much significance to the entry of default, however, by claiming that the default order negated any standing that defendants might have had to move for summary judgment. He cites Newhouse v. Probert, 608 F.Supp. 978 (W.D.Mich.1985), in support of his position. In Newhouse, the district court held that a party in default under Federal Rule of Civil Procedure 55(a) lacked standing to file a third-party complaint as a "defending party" pursuant to Federal Rule of Civil Procedure 14(a). Id. at 985. Filing a third-party complaint while in default is much different than moving to set aside a default and concurrently moving for summary judgment. The former action attempts to bring other parties into the proceeding while the party is in default, while the latter action addresses the legal sufficiency of the suit between the current parties. Even though a defendant is in default, the sufficiency of a plaintiff's allegations to establish a claim for relief remains an issue. See Wahl v. McKiver, 773 F.2d 1169 (11th Cir.1985) (district court correct in denying motion for default judgment against several defendants since plaintiff's allegations did not state a cause of action against those defendants); 6 Moore's Federal Practice § 55.03(2) (1993). Further, as the district court noted, it first set aside the default, and then granted summary judgment. Cf. Hill v. Barbour, 787 F.Supp. 146, 148 (N.D.Ill.1992) (despite plaintiff's objections to the propriety of considering defendant's motion for summary judgment, once court vacated order of default it "removed any disability on [defendant] to proceed in the case"). Thus, the trial court did not err in considering defendants' motion for summary judgment.
 
 
 14
 Plaintiff also contends that the defendants violated Local Rule 7.1(a) by failing to seek plaintiff's concurrence in their motion for summary judgment.[2] The parties dispute whether the defendants' summary judgment motion was even discussed when counsel for the respective parties talked about the proposed stipulation to set aside the default. Defendants maintain that the issue was raised, and they therefore met the "spirit" of the local rule. Conversely, plaintiff asserts that the defendants did not mention the summary judgment motion at all, and compounded their duplicity by "hiding" the summary judgment motion in a stack of other documents sent to plaintiff. The district court did not abuse its discretion in declining to reconsider its grant of summary judgment based on the defendants' apparent violation of the local rules. Although the defendants neglected to set forth in their summary judgment motion that concurrence had been sought, these matters are best left to the district court, particularly when the plaintiff has failed to demonstrate that it was prejudiced by the defendants' failure to abide by the local rules.
 
 
 15
 Finally, plaintiff charges that he did not receive a ten-day notice of the motion for summary judgment and therefore was unable to properly challenge the motion. According to plaintiff, he first received actual notice of the pending motion when he talked with the clerk's office about the status of the parties' proposed stipulation, only seven days prior to the district court's grant of summary judgment to the defendants. As the district court properly concluded, plaintiff cannot complain of lack of notice when he received the summary judgment motion over a month before the district court ruled on it. Moreover, the plaintiff has had sufficient opportunity to challenge the grant of summary judgment before this court, for as a reviewing court we review the grant of summary judgment de novo. Thus, none of the alleged procedural irregularities about which plaintiff complains can serve as a basis for reversing the district court's grant of summary judgment.
 
 III.
 
 16
 Turning to the substantive question of whether a claim has been stated upon which relief can be granted, plaintiff argues that the district court ignored many of the plaintiff's § 1983 allegations when granting defendants' motion for summary judgment for failure to state a claim. The district court read the § 1983 claim to allege only that Officer Walls' death was caused by inadequate training and supervision, but, according to plaintiff, his claim involved much more than that. Specifically, plaintiff's complaint also alleged that the decision to storm the barricaded gunman's apartment constituted a willful and deliberate indifference to Officer Wall's Fifth and Fourteenth Amendment right to life because his superiors knew or should have known that department procedure as well as universally accepted procedure in such a situation was to wait out the gunman.
 
 
 17
 For § 1983 liability to attach, an individual must have been deprived of his constitutional rights by a person acting under color of state law. Walker v. Norris, 917 F.2d 1449, 1452 (6th Cir.1990). In this case, we consider whether plaintiff's complaint has alleged a constitutional violation. Essentially, plaintiff's claims against the City of Detroit[3] and individual officers advance two theories. First, the city's failure to properly train its police officers resulted in a violation of Officer Wall's constitutional rights. Second, the defendants' "deliberate indifference" to Officer Wall's safety violated his substantive due process right to life.
 
 
 18
 The Supreme Court formally recognized the failure to train theory as a basis for § 1983 liability in City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989). However, the Court explained that it would not suffice "to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct." Id. at 391. A constitutional violation could be alleged only when the inadequate training of police officers amounted to " 'deliberate indifference' to the rights of persons with whom the police come into contact." City of Harker Heights, --- U.S. ----, 112 S.Ct. at 1068 (citing Harris, 489 U.S. at 388). Even assuming that the plaintiff's allegations of inadequate training are correct, plaintiff has not made a sustainable allegation of deliberate indifference because the affidavits and other evidence produced at this stage indicate that the officers had significant training as a special response team.
 
 
 19
 In City of Harker Heights, the Court considered the § 1983 claim of a woman whose husband worked for the city sanitation department and died of asphyxia after entering a manhole to unstop a sewer line. The woman alleged that the city failed to train its employees and failed to provide employees a reasonably safe work environment, but the Court concluded that she did not state a cognizable § 1983 claim because "the city's alleged failure to train its employees, or to warn them about known risks of harm, was [not] an omission that can properly be characterized as arbitrary, or conscience-shocking, in a constitutional sense." Id., 112 S.Ct. at 1070. Borrowing that standard here, the City of Detroit's alleged conduct cannot be characterized as shocking to the conscience.
 
 
 20
 Plaintiff's second theory fails for the same reason. Plaintiff argues that Detroit police policy as well as universally accepted police policy is to "wait out" barricaded gunmen when lives are not in jeopardy.[4] Thus, unlike the plaintiff in City of Harker Heights who simply alleged a failure to provide a reasonably safe work environment, plaintiff here contends that defendants instructed Officer Walls to go into the apartment and arrest the gunman when they knew or should have known that there was a significant risk that he could be injured. Cf. id. at 1069 ("[Plaintiff] does not even allege that [her husband's] supervisor instructed him to go into the sewer when the supervisor knew or should have known that there was a significant risk that he would be injured."). Plaintiff's artful attempt to recast his complaint in terms distinguishable from City of Harker Heights is unavailing, because it misunderstands one of the central tenets of the Supreme Court's holding in that case: the Constitution does not guarantee police officers and other municipal employees a workplace free of unreasonable risks of harm. See id. at 1070.
 
 
 21
 Nowhere does plaintiff's complaint allege that Officer Walls did not understand or appreciate the risk involved in his job. Cf. L.W. v. Grubbs, 974 F.2d 119, 122 (9th Cir.1992) (registered nurse employed by State of Oregon at a prison stated a § 1983 claim after being raped and terrorized by an inmate because state led her to believe that she would not be required to work alone with violent sex offenders but then defendants allegedly knowingly assigned a violent sex offender to work alone with her without her knowledge), petition for cert. filed, 61 U.S.L.W. 3717 (U.S. Apr. 5, 1993) (No. 92-1620). Nor could it, because a police officer's job is inherently dangerous and all officers know or should know of the risks involved in the position. Thus, plaintiff's complaint becomes a Monday morning critique of the Detroit Police Department's handling of a tense barricaded gunman situation. Without more, the Constitution is not implicated when the City of Detroit's Deputy Chief of Police orders officers to go in and arrest a barricaded gunman. Such a command decision does not rise to the level of conscience-shocking. City of Harker Heights, 112 S.Ct. at 1070; see also Nobles v. Brown, 985 F.2d 235, 237 (6th Cir.1992) (rejecting "shocks the conscience" test in § 1983 suit by prison guard held captive and raped by a prisoner because generally speaking the "State's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause") (citation omitted). Officers must be free to make field decisions under circumstances such as were presented here, even if such decisions violate policy.
 
 
 22
 AFFIRMED.
 
 
 
 *
 The Honorable S. Arthur Spiegel, United States District Court for the Southern District of Ohio, sitting by designation
 
 
 [1]
 Plaintiff contends on appeal that defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 was in actuality a 12(b)(6) motion to dismiss for failure to state a valid claim. However defendants' motion is characterized, the core issue is whether plaintiff has stated a viable § 1983 claim. On appeal, plaintiff has also supplemented his pleadings with documents to which we have referred in developing the facts of this case. Thus, our de novo evaluation of the dismissal of plaintiff's complaint is best described as review of a grant of summary judgment
 
 
 [2]
 Local Rule 7.1(a) of the United States District Court for the Eastern District of Michigan states:
 (a) Seeking Concurrence in Motions. It is the responsibility of the movant ascertain whether or not the contemplated motion will be opposed. If the movant obtains concurrence, the subject matter of the motion contemplated may be made a matter of record by order of the Court upon stipulation by both parties. If concurrence is not obtained, the motion shall state that, on a specific date, a conference between attorneys was held in which counsel for the moving party or a party without counsel explained the nature of the motion and its legal basis; that concurrence in the relief sought was requested and was not granted, or that, despite reasonable efforts which shall be specified in the motion counsel was unable to conduct a conference with opposing counsel, and hence it has become necessary to bring this motion. The Court may tax costs for unreasonable withholding of consent. Discovery motions shall also be governed by LR 37.1.
 This rule is largely an empty formality in the case of dispositive motions since, if the other party agreed, the parties could simply stipulate to a dismissal.
 
 
 [3]
 Plaintiff also named the City of Detroit Police Department as a defendant. This is not proper, for municipal departments enjoy no status independent of the municipality itself and therefore cannot be held separately liable for § 1983 damages. See Brandon v. Holt, 469 U.S. 464, 472 (1985); Stump v. Gates, 777 F.Supp. 808, 816 (D.Colo.1991) ("[A]lthough some courts have overlooked it, naming a municipal department as a defendant is not an appropriate means of pleading a § 1983 action against a municipality."), aff'd, 986 F.2d 1429 (10th Cir.1993))
 
 
 [4]
 Plaintiff refers to Detroit Police Department policy to bolster his claims. The Detroit Police Department does indeed have a policy to deal with barricaded gunman situations. That policy, effective July 3, 1978, provides in part:
 Once the subject is isolated and escape has been blocked, time becomes a prime defensive tool. It is at this point that command officers can consider alternative actions and consider the possible consequences of each.
 
 
 [4]
 1 Containment. The first tactical consideration should be that of containing the subject and attempting to talk the subject into surrendering. This contact can be made by telephone or loud hailer. The longer the subject is given to consider alternatives, the more likely it is that the subject will realize the futility of the position
 Prior to dispersing gas or assaulting the building, an attempt must be made to contact the occupants of the building, by phone, loud hailer, or other appropriate means. Friends or relatives of the subject should be contacted and interviewed in order to learn as much as possible about the subject's background.
 
 
 [4]
 2 Gas. The use of gas to force the subject from the building is a second tactical consideration. The decision to employ gas will be that of the tactical commander, when the situation is life-threatening. Tear gas will not be used in tactical situations which are non-life threatening without specific authorization from the Chief of Police, executive deputy chief, or the appropriate deputy chief after full review of the facts in a given situation
 
 
 [4]
 3 Assault. An assault upon the position of the subject is a tactic which, when being considered, the tactical commander must assess possible consequences. An assault would normally be attempted when all else has failed and there is imminent danger of serious injury or death to officers or citizens