Francine HUMES, et al. Plaintiffs,

v.

**A.C. GILLESS, individually and in his capacity as Sheriff of Shelby County, Tennessee, et al. Defendants.**

No. 01–2028 D/A.

United States District Court, W.D. Tennessee, Western Division.

July 30, 2001.

Mark A. Allen, Allen Godwin Morris Laurenzi & Bloomfield, P.C., Memphis, TN, for Francine Humes, Ronald Williams, Tiera Demesma, Darren Yancey, Rita Williamson, Trent Woods, Sharon Sutton, Myra Wilkins, Angela Moore, Alfonso S. Marshall, Jr., Catherine Lacy, Ttosha Hubbard, Geraldine Harvey, Kenneth B. Harris, Clementene Dean Meyers, Karlon Rose Dallas, Anthony Jones, plaintiffs.

Fred E. Jones, Jr., Shelby County Attorney's Office, Brian L. Kuhn, Ford & Harrison, Memphis, TN, for A.C. Gilless, Individually and in his capacity as Sheriff of Shelby County, Tennessee, Marron Hopkins, Individually and in his capacity as Chief Jailer of Shelby County, Tennessee, Don Wright, Individually and in his capacity as Chief Deputy of Shelby County, Tennessee, Robert Harper, Individually and in his capacity as Assistant Chief Deputy of Shelby County, Tennessee, Neil Shea, Chief, Individually and his capacity Training Director for the Shelby County Sheriff's Department, Mary Peete, Inspector, Individually and in her capacity as an Inspector for the Shelby County Sheriff's Department, Roy Rodgers, Inspector, Individually and in his capacity as an Inspector for the Shelby County Sheriff's Department, Eddie Dowdy, Individually and in his capacity as Security Commander for the Shelby County Jail and Sheriff's Department, Mary Wilson, Individually and in her capacity as a Captain and Shift Commander for the Shelby County Jail and Sheriff's Department, Calvin Ester,

Individually and in his capacity as a Lieutenant and Instructor for the Shelby County Sheriff's Department, C.W. Jones, Individually and in his capacity as a Lieutenant for the Shelby County Jail and Sheriff's Department, Harry Scott, Individually and in his capacity as an Officer for the Shelby County Jail and Sheriff's Department, Bobby Ervin, Individually and in his capacity as an Officer for the Shelby County Jail and Sheriff's Department, Shelby County Sheriff's Department, Shelby County Government, Montie Hunt, Individually and in her capacity as a Lieutenant and Instructor for the Shelby County Sheriff's Department, defendants.

## ORDER DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION TO DISMISS

DONALD, District Judge.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants move to dismiss Plaintiffs' claims arising under 42 U.S.C. § 1983, the Tennessee Constitution, and common law. Specifically, Plaintiffs, who are deputy jailers, assert that Defendants, including the Sheriff and various other deputies, violated the Fourth and Fourteenth Amendment of the Federal Constitution, as well as §§ 7 and 8 of Article I of the Tennessee Constitution, when they carried out a training exercise designed to simulate an inmate uprising. Plaintiffs also contend that Defendants' actions constituted assault, battery, false imprisonment and intentional infliction of emotional distress. The Court has jurisdiction over the federal-law claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the state-law claims under 28 U.S.C. § 1367. For the reasons herein, the Court **DENIES** in part and **GRANTS** in part Defendants' motion to dismiss.

## I. Factual Background

Plaintiffs allege the following. Francine Humes ("Humes"), Catherine Lacy ("Lacy"), and Geraldine Harvey ("Harvey"), including fourteen others, were employed as deputy jailers by the Shelby County Sheriff's Department ("Department") and stationed on the Shelby County Jail's second floor. In June of 2000, Defendants, including A.C. Gilless, Sheriff of Shelby County; Don Wright, Chief Deputy Sheriff; Robert Harper, Assistant Chief Deputy Sheriff; Neil Shea, Training Director of the Department; Marron Hopkins, Chief Jailer of Shelby County; Mary Peete, an Inspector for the Department; Roy Rodgers, an Inspector at the Jail Division; Eddie Dowdy, a Commander with Security at the Shelby County Jail; Mary Wilson, a Captain and Shift Commander at the Shelby County Jail; and C.W. Jones, a Lieutenant at the Shelby County Jail, created a training exercise intended to prepare jailers for a hostage situation. The Department chose two probationary jailers, Defendants Harry Scott ("Scott") and Bobby Ervin ("Ervin"), to play the role of inmates, who would, unbeknownst to the other jailers, attempt to "take over" the Shelby County Jail. The Department had trained neither Scott nor Ervin in conducting hostage takeover scenarios.

On June 14, 2000, despite carrying metal prototypes of guns, Scott and Ervin were escorted into the jail without incident. Scott and Ervin entered the control room of the second floor, shouting and brandishing handguns. Scott and Ervin ordered Humes, Lacy, and Harvey to line up against the wall, and pressed their handguns to the back of Plaintiffs' heads. Yelling obscenities, Scott and Ervin forced Humes to operate the control panel at gunpoint. Other Plaintiffs, including Lacy, were pushed to the floor, threatened with

their life, and kicked. Scott and Ervin ordered some Plaintiffs to remove their shoes and then dragged those Plaintiffs across the floor. Either Scott or Ervin then announced on the intercom that they had taken over the second floor. Plaintiff jailers outside the control room began to panic. Scott and Ervin threatened to release inmates and pointed their guns at Plaintiffs outside the control room.

Plaintiffs had not received sufficient training for a hostage crisis, were not armed, and were not trained in how to use firearms. Also, gang members in or around the jail had previously threatened several of the Plaintiffs, and during the mock uprising many of the Plaintiffs feared that gang members were finally acting on those threats. The hostage scenario lasted between twenty and thirty minutes, during which time the second floor was locked down. Following the incident, fifteen of the Plaintiffs were sent home, and one required emergency room attention.

## II. Motion to Dismiss Standard

A party may bring a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). The purpose of a motion to dismiss under Rule 12(b)(6) is to test the formal sufficiency of the claim, not to resolve the facts or merits of the case. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). This motion only tests whether a cognizable claim has been pleaded in the complaint. *Scheid v. Fanny Farmer Candy Shops, Inc.,* 859 F.2d 434, 436 (6th Cir.1988). Essentially, it allows the court to dismiss meritless cases which would otherwise waste scarce judicial resources and result in unnecessary discovery. *See, e.g., Neitzke v. Williams,* 490 U.S. 319, 326–27, 109 S.Ct. 1827, 1832, 104 L.Ed.2d 338 (1989).

Generally, a motion for failure to state a claim under Fed.R.Civ.P. 12(b)(6) should be made prior to the filing of a responsive pleading. 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 299–300 (2d ed.1990). However, later filing may be permitted. Fed.R.Civ.P. 12(h).

The Supreme Court has held that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). *See also Neitzke,* 490 U.S. at 326–27, 109 S.Ct. at 1832; *Lewis v. ACB Bus. Servs., Inc.,* 135 F.3d 389, 405 (6th Cir.1998). Thus, the standard to be applied when evaluating a motion to dismiss for failure to state a claim is very liberal in favor of the party opposing the motion. *Westlake v. Lucas,* 537 F.2d 857, 858 (6th Cir.1976). Even if the plaintiff's chances of success are remote or unlikely, a motion to dismiss should be denied. *Scheuer,* 416 U.S. at 236, 94 S.Ct. at 1686.

To determine whether a motion to dismiss should be granted, the court must first examine the complaint. The complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). The complaint must provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley,* 355 U.S. at 47, 78 S.Ct. at 103; *Westlake,* 537 F.2d at 858. The complaint need not specify all the particularities of the claim, *id.,* and if the complaint is merely vague or ambiguous, a motion under Fed.R.Civ.P. 12(e) for a more definite statement is the proper avenue rather than under Fed.R.Civ.P. 12(b)(6). 5A Charles Alan Wright & Ar-

thur R. Miller, *Federal Practice and Procedure* § 1356, at 296–97 (2d ed.1990). However, the plaintiff has an obligation to allege the essential material facts of the case. *Scheid*, 859 F.2d at 436–37. All facts taken as true in the complaint must be "well-pleaded." *Lewis*, 135 F.3d at 405. "Well-pleaded facts" refers to those facts which are legally capable of being proved. 71 C.J.S. *Pleading* § 426 (1951).

In reviewing the complaint, the court must accept as true all factual allegations in the complaint and construe them in the light most favorable to the plaintiff. *Scheuer*, 416 U.S. at 236, 94 S.Ct. at 1686; *Windsor v. The Tennessean*, 719 F.2d 155, 158 (6th Cir.1983), *cert. denied*, 469 U.S. 826, 105 S.Ct. 105, 83 L.Ed.2d 50 (1984). Indeed, the facts as alleged by the plaintiff cannot be disbelieved by the court. *Neitzke*, 490 U.S. at 327, 109 S.Ct. at 1832; *In re Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir.1997), *cert. denied*, 523 U.S. 1106, 118 S.Ct. 1675, 140 L.Ed.2d 813 (1998). Where there are conflicting interpretations of the facts, they must be construed in the plaintiff's favor. *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1039–40 (6th Cir.1991). However, legal conclusions or unwarranted factual inferences should not be accepted as true. *Lewis*, 135 F.3d at 405.

### III. Analysis

#### A. Section 1983 claim

Under 42 U.S.C. § 1983, a plaintiff must show that a defendant acting under color of state law deprived the plaintiff of his or her constitutional rights. Section 1983 is not the source of any substantive right, but merely provides a method for vindicating federal rights elsewhere conferred. *Graham v. Connor*, 490 U.S. 386, 393–94, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989). A municipality is subject to liability only if a claimant's constitutional rights have been violated. *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986) (holding that, in the Fourth Amendment context, absolving the individual officer of liability shields the municipality from liability). Accordingly, finding municipal liability depends on whether (1) plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation. *Collins v. City of Harker Heights*, 503 U.S. 115, 120, 112 S.Ct. 1061, 1066, 117 L.Ed.2d 261 (1992). As to the second prong, a municipality is only responsible for a constitutional violation when its policy or custom causes the injury. *City of Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989); *Rymer v. Davis*, 775 F.2d 756 (6th Cir.1985) (reaffirming its decision in *Rymer v. Davis*, 754 F.2d 198, 200 (6th Cir.1985)). This protects a municipality from being subject to respondeat superior or vicarious liability. *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 694–95, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978).

#### 1. Whether the Fourth Amendment applies

▮ Plaintiffs allege that Defendants' actions constituted an unlawful seizure and therefore violated their Fourth Amendment rights. A person has been seized only if, under the circumstances, a reasonable person would have believed that he or she was not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality); *I.N.S. v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984). The Supreme Court, however, has created a bright-line rule that, if an officer lays hands on an intended subject, a seizure occurs. *California v. Hodari D.*, 499 U.S. 621, 625, 111 S.Ct. 1547, 1550, 113 L.Ed.2d 690 (1991); *County of Sacramento v. Lewis*, 523 U.S. 833, 844, 118 S.Ct.

1708, 1714, 140 L.Ed.2d 1043 (1998). In the present case, Scott and Ervin not only dragged Humes, Lacy, and Harvey across the floor, but also pointed guns to the back of their heads. As to Humes, Lacy, Harvey, and other similarly treated Plaintiffs, a seizure therefore occurred.

■ Other circumstances, besides physical contact, also suggest that one's freedom of movement has been terminated. For example, an officer who displays a weapon may effect a seizure where the subject submits to such show of authority. *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877; *Hodari D.,* 499 U.S. at 626, 111 S.Ct. at 1551. In the present case, the Plaintiffs were threatened with their life at gunpoint, and a reasonable person would surmise that their freedom of movement was terminated. Also, Plaintiffs allege that they complied with the gunmen's orders, thereby submitting to Scott and Ervin's display of authority. Therefore, the Court finds that Defendants' actions constituted a seizure under the Fourth Amendment.

Finding that a seizure has occurred, under the facts alleged, is not altered by the Supreme Court's decision in *Delgado.* There the Court held that a factory sweep by INS Agents did not constitute a seizure of all the workers, as the workers' freedom of movement was already restricted by the employer. *Delgado,* 466 U.S. at 221, 104 S.Ct. at 1765. In *Delgado,* the workers could still continue performing their jobs and were free to move within the factory. INS officers merely interviewed workers individually, and usually for a brief period. Therefore, the actions of the INS Agents minimally increased the restrictions on the workers' freedom of movement. Like the workers in *Delgado,* Plaintiffs voluntarily complied with restrictions to their freedom of movement attendant to their employment responsibilities. The present case, however, is distinguishable because Plaintiffs were threatened with their life at gunpoint. Plaintiffs were not detained for a brief period of time, but instead were pinned down between twenty or thirty minutes in fear of their lives. Finally, unlike the workers in *Delgado,* the second floor jailers were unable to continue performing their job tasks.

■ Turning to a different consideration, the fact that Scott and Ervin were disguised as inmates neither precludes the Fourth Amendment's application, nor does it insulate them from § 1983 liability. The actions of a governmental official who is disguised must still comply with the Fourth Amendment. In fact, the Fourth Amendment applies even if a *private person* effectuates a seizure while acting as an instrument of the government. *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 614–15, 109 S.Ct. 1402, 1411–412, 103 L.Ed.2d 639 (1989). Further, the disguise of Scott and Ervin does not insulate them from the technical requirements of a making a seizure. As discussed, in cases where an officer does not physically touch the subject, the subject must actually submit to the officer's display of authority for there to be a seizure. *Hodari D.,* 499 U.S. at 626, 111 S.Ct. at 1551. One's "authority," however, is not dependent on one's known status as a law enforcement officer. For example, an undercover police officer who does not identify himself as such may still make a seizure by a show of authority. *See, e.g., United States v. Laboy,* 979 F.2d 795, 798–99 (10th Cir.1992) (finding no seizure of the defendant where undercover agent merely waved at the defendant, signaling him to come over, and asking a few questions).

■ As to § 1983, the government cannot shield itself from the statute's prohibitions by posing as non-state actors. Although liability under § 1983 is only triggered by persons acting under color

of state law, the Supreme Court has equated the "color of state law" requirement with the permissive "state action" doctrine: that liability may attach where the actor is clothed with state authority. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929, 102 S.Ct. 2744, 2749, 73 L.Ed.2d 482 (1982). Scott and Ervin, though appearing to be inmates, were in fact acting pursuant to the Department's orders, and therefore acting under color of state law.

As a final matter, the fact that this incident did not occur within the course of a criminal investigation does not remove it from the purview of the Fourth Amendment. The Fourth Amendment's text does not indicate that its coverage is so limited, but instead reads that the "right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated ...." Although the vast majority of cases discussing the Fourth Amendment occur in the context of a criminal investigation, courts have applied its protections in regulatory law investigations, government employment matters, and in the context of public school disciplinary procedures. *See, e.g., Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967) (applying the Fourth Amendment's protections to an individual subjected to a search by a regulatory agency); *O'Connor v. Ortega*, 480 U.S. 709, 714, 107 S.Ct. 1492, 1496, 94 L.Ed.2d 714 (1987) (stating that "[s]earches and seizures by government employers or supervisors of private property of their employees ... are subject to the restraints of the Fourth Amendment"); *New Jersey v. T.L.O.*, 469 U.S. 325, 333, 105 S.Ct. 733, 738, 83 L.Ed.2d 720 (1985) (applying Fourth Amendment protections to the search for "contraband" that violates school rules). Finally, the Supreme Court has broadly framed its test for whether there has been a seizure, stating that it occurs when "government actors have, by means of physical force or show of authority, in some way restrained the liberty of a citizen." *Graham*, 490 U.S. at 394 n. 10, 109 S.Ct. at 1870 n. 10. Accordingly, the Court finds that Defendants' actions, though not pursuant to a criminal investigation, are subject to the Fourth Amendment's coverage.

Because Plaintiffs have alleged sufficient facts to trigger the Fourth Amendment's protections, Plaintiffs' Fourteenth Amendment claims are dismissed, as specific constitutional protections control over general provisions. *County of Sacramento v. Lewis*, 523 U.S. 833, 842, 118 S.Ct. 1708, 1714, 140 L.Ed.2d 1043 (1998); *see also Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). Accordingly, the Court GRANTS Defendants' motion to dismiss Plaintiffs' § 1983 claim as to a cause of action under the Fourteenth Amendment.

### 2. Whether Plaintiffs state a cause of action under the Fourth Amendment

Defendants contend that, even if there has been a seizure, Plaintiffs have not alleged sufficient facts to show that such a seizure was unreasonable. As Defendants suggest, there must be a mutual accommodation between institutional interests and the individual interests protected by the Fourth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 546, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979). Determining whether a seizure is reasonable requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Graham*, 490 U.S. at 394, 109 S.Ct. at 1870.

#### a. Governmental interests

Defendants assert that they had strong interests in conducting the mock inmate

uprising because the training exercise was designed to help ensure the security of both inmates and jailers should such a crisis develop. The government's interests in preserving a safe environment in a jail are indeed paramount. *Bell,* 441 U.S. at 547, 99 S.Ct. at 1878. Prison officials are to be accorded wide-ranging deference in their adoption and execution of practices that in their judgment are necessary to maintain institutional security. *Id.* The incidence of inmate uprisings is not an uncommon event in the history of jails and prisons. Therefore, Defendants' interests in preparing its correctional employees for such a scenario is important to fulfilling its mission in counteracting potentially explosive events as quickly and effectively as possible.

### b.  Plaintiffs' Fourth Amendment interests

■ The Fourth Amendment provides the right to be secure against an unreasonable search or seizure. When Fourth Amendment analysis turns from *searches* of a person to *seizures* of a person, the focal point of judicial scrutiny shifts from ascertaining a person's privacy interests to ascertaining a person's fundamental interests in liberty, freedom of movement, and personal security. Wayne R. LaFave, *Pinguitudinous Police, Pachydermatous Prey: Whence Fourth Amendment Seizures?,* 1991 U. Ill. L.Rev. 729, 758; Ronald J. Bacigal, *The Right of the People to be Secure,* 82 Ky. L.J. 145, 150–51 (1993). Although it is not an entirely easy task to sift out privacy concerns, the Fourth Amendment's protections against the seizure of a person are designed to prevent the arbitrary and oppressive interference with the personal security of individuals. The line of cases extending the Fourth Amendment's coverage to unnecessary force claims shows that the Amendment also protects against the unnecessary invasion of a citizen's bodily integrity. *See,*

*e.g., Graham,* 490 U.S. at 395, 109 S.Ct. at 1870; *Saucier v. Katz,* 531 U.S. 991, 121 S.Ct. 2151, 2158, 150 L.Ed.2d 272 (2001).

### c.  Balancing  Plaintiffs'  interests against institutional interests

■ In determining whether Defendants' actions were reasonable requires the balancing of the (a) nature and quality of the intrusion on the individual's Fourth Amendment interests against (b) the countervailing governmental interests at stake. *Bell,* 441 U.S. at 546, 99 S.Ct. at 1878. In balancing these two prongs, the Court must determine the weight of the Plaintiffs' interests, as well as the institutional interests.

Defendants cite *Collins v. City of Harker Heights,* 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992), and *Walls v. City of Detroit,* No. 92–1846, 1993 WL 158498, *5 (6th Cir. May 14, 1993) (unreported), to support their contention that Plaintiffs' Fourth Amendment interests in liberty and security are so diminished that any work-related intrusion on those interests cannot be unconstitutional. Defendants' reliance on these cases, however, is misguided. In *Collins,* an employee was killed from dangers associated with work repairing sewers. There, the plaintiff alleged that the city failed to provide the decedent with a safe workplace. The Supreme Court held that the municipal employer was not responsible for the employee's injury, reasoning that constitutional protections generally do not guarantee certain minimal levels of personal security. *Collins,* 503 U.S. at 127, 112 S.Ct. at 1069. The Court stated that constitutional protections are not intended to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society. *Id.* at 128, 112 S.Ct. at 1070.

In *Walls,* the plaintiff sued on behalf of decedent, who was a police officer ordered to storm an apartment and restrain a barricaded gunman. The plaintiff brought the claim under the Fourteenth Amendment, and argued that the deputy chief's decision to send the decedent into the apartment exhibited deliberate indifference to the decedent's security and bodily integrity. The plaintiff also asserted that the deputy chief's failure to warn the decedent of the known dangers shocked the conscience. Unlike in *Collins,* where the municipality merely failed to provide a reasonably safe work environment, the plaintiff in *Walls* alleged that the deputy chief ordered the decedent to put his life in danger. The Court, however, dismissed the plaintiff's claims, reasoning that the Constitution does not guarantee police officers a workplace free of unreasonable risks of harm. *Walls,* 1993 WL 158498 at *5.

Thus, Defendants argue that *Collins* and *Walls* stand for the proposition that, at the workplace, one's expectations of security and bodily integrity are subject to the risks of the particular workplace. Although the Court agrees with Defendants' basic premise, the Court disagrees that *Collins* and *Walls* preclude a finding that Plaintiffs' constitutional rights have been violated in the instant case.

In both *Collins* and *Walls,* risks associated with plaintiffs' expected job duties led to tragic results, but neither plaintiff had a constitutional remedy. In this case, however, Plaintiffs' injuries did not occur as a result of the risks ordinarily associated with their employment duties. Inmates didn't riot. Inmates didn't take Plaintiffs hostage. A supervisor did not send a deputy jailer into a cell to control a dangerous situation. Instead, the Department initiated a training exercise that was not only perceived as life threatening, but actually put Plaintiffs into a life threatening situation. To illustrate the point, under gun-point, it is conceivable that Plaintiffs may have let actual inmates free. In other words, because Defendants may not be liable for injuries attendant to an *actual* inmate uprising, it does not mean that Defendants may create such a scenario and be immune from liability.

The Court acknowledges that Plaintiffs' Fourth Amendment interests are diminished in a prison environment. Prison environments are highly regulated, and strict order must be maintained. The prison administration must be constantly vigilant to prevent escape plots, reduce the flow of weapons and drugs into the building, and maintain the safety and welfare of inmates, jailers, and the public. *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984). Therefore, in this strictly controlled environment, regardless of one's status as a jailer or inmate, liberty is curtailed.

A jailer's security and bodily integrity interests are also diminished. A jail is a dangerous place. Inmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society, and have shown an inability to appreciate the rights of others. *Hudson,* 468 U.S. at 526, 104 S.Ct. at 3200. Inmate uprisings and inmates assaulting jailers are not uncommon incidents. *See* Statistics of United States Bureau of Prisons (July 1999 through June 2001); *see also Hudson,* 468 U.S. at 526, 104 S.Ct. at 3200. In fact, Plaintiffs allege in their complaint that gang members, both inside and outside the jail, have threatened them. Put simply, Plaintiffs' expectations of security, liberty, and bodily integrity are not equivalent to those of a citizen strolling down a street or to a person sitting in his or her living room. The Court is mindful, however, that although these interests are diminished, the government does not have

carte blanche discretion to intrude on those interests.

In contrast to Plaintiffs' diminished Fourth Amendment interests, the government's interests in this case are strong. It is imperative that jailers are trained to handle the dangerous and complex scenarios that the prison environment can create. Inmate violence and rioting are not uncommon events. By way of example, federal prisons, in the last two years, have seen over 700 serious inmate assaults and almost 200 incidents of riots or encouragement of riots. *See* Statistics of United States Bureau of Prisons (July 1999 through June 2001). Similarly, inmates taking jailers hostage is noted in various cases. *See, e.g., Whitley v. Albers*, 475 U.S. 312, 315, 106 S.Ct. 1078, 1081, 89 L.Ed.2d 251 (1986); *Curry v. Scott*, 249 F.3d 493, 498 fn. 1 (6th Cir.2001); *In re Long Term Administrative Segregation of Inmates Designated as Five Percenters*, 174 F.3d 464, 466 (4th Cir.1999). Further, Defendants' efforts to create a training exercise that appears to be real is not per se unreasonable. Such method of training may better prepare jailers mentally and emotionally for an actual uprising.

In sum, Plaintiffs' Fourth Amendment interests, though viable, are diminished, while the governmental interests in the present case are strong. Taking Plaintiffs' facts as true, however, a reasonable jury could find that the extent of the government's alleged intrusion on Plaintiffs' security, bodily integrity, and liberty interests tips the balance in Plaintiffs' favor. Scott's and Ervin's detention of Plaintiffs was not brief, but was excruciatingly long, lasting between twenty and thirty minutes. Such length of time not only subjected Plaintiffs to an intense degree of fear of bodily harm or death, but with each passing minute, posed a greater risk that bodily harm or death would actually occur. Guns were pressed against the back of Plaintiffs' heads or pointed towards them. Some Plaintiffs were kicked, manhandled, and ordered to the floor. Scott and Ervin were allegedly fresh recruits who had little or no training in handling such matters. Putting untrained individuals into such a highly charged environment could invite a situation to devolve into unpredictable and tragic results. That Plaintiffs were forcibly detained in a life-threatening situation for over twenty minutes may be considered unreasonable. In balancing the Plaintiffs' interests against the institutional interests, the Court finds that Plaintiffs have sufficiently alleged facts suggesting that Defendants' actions, however well-intended, were so intrusive that society would objectively find them unreasonable. *Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967) (J. Harlan, concurring).

## 2. Municipal liability

Having found that Plaintiffs sufficiently allege a Fourth Amendment violation, the Court turns to the question of municipal liability. A municipality may not be held liable for a constitutional violation unless the action was pursuant to policy. *Monell*, 436 at 691, 98 S.Ct. at 2036. Although the Supreme Court has held that a municipality may not be liable under any respondeat superior theory, a municipality may be held accountable where it is the moving force behind a constitutional violation. *Monell*, 436 U.S. 658, 694–95, 98 S.Ct. at 2037–38, 56 L.Ed.2d 611.

It is for this reason that a wrongful act by an single officer without any policy-making authority does not establish municipal policy or custom, *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823–24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), or that a reckless failure to respond to an officer's unconstitutional action in a single incident does not, by itself, constitute a

custom. *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir.1996). However, when an authorized decision-maker adopts a particular course of action, such a decision represents an official policy of that governmental entity. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). In the present case, Plaintiffs alleged that A.C. Gilless, Sheriff of Shelby County, as well as Don Wright, Chief Deputy Sheriff; Robert Harper, Assistant Chief Deputy Sheriff; and Neil Shea, Training Director of the Department, all participated in or at least approved of a the plan to send Scott and Ervin into the jail to conduct the mock training exercise. The alleged facts therefore suggest that Scott's and Ervin's actions came at the behest of the county's decision-makers.

■ The Court rejects Defendants' argument that Plaintiffs' failure to allege "deliberate indifference" is fatal to their claim. Municipal supervisors must exhibit "deliberate indifference" for municipal liability to attach when a plaintiff's claim hinges on a supervisor's *failure to intervene* in the unlawful actions of subordinates. "Failure-to-intervene claims" commonly stem from the failure to screen out a bad applicant, to supervise, discipline, and monitor officers who engage in misconduct, or to properly train officers. *See, e.g., Board of County Commissioners v. Brown*, 520 U.S. 397, 411, 117 S.Ct. 1382, 1392, 137 L.Ed.2d 626 (1997); *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989). In the instant case, however, Plaintiffs do not allege that supervisors failed to intervene. Instead, Plaintiffs allege that municipal Defendants ordered Scott and Ervin to engage in activity that constituted an unlawful seizure. Accordingly, the Court **DENIES** the motion to dismiss Plaintiffs' Fourth Amendment claim against Defendants, either in their individual or official capacity.

## B. State claims

■ All Plaintiffs have alleged that Defendants' actions violated §§ 7 and 8 of Article I of the Tennessee Constitution, and also constituted assault, intentional infliction of emotional distress, and false imprisonment. Hume, Lacy, and Harvey also allege that Defendants' actions constituted battery. Defendants only challenge the assault and battery claims. Defendants assert that only Hume, Lacy, and Harvey have alleged facts that could constitute a claim for assault and battery. Defendants' assertion as to the battery claim is preempted by Plaintiffs, as only Hume, Lacy, and Harvey allege a battery claim. (Second Amended Complaint, ¶ 55). As to the assault claim, under Tennessee law, an assault is an attempt, or the unequivocal appearance of an attempt, to do a corporal injury to another with the intent to do harm. *Rushing v. State*, 196 Tenn. 515, 268 S.W.2d 563, 567 (1954); *Alexander v. Beale Street Blues Co., Inc.*, 108 F.Supp.2d 934, 945–946 (W.D.Tenn.1999). Defendants contend that the fourteen Plaintiffs other than Hume, Lacy, and Harvey have not sufficiently alleged a cause of action for assault. However, the waving of a pistol from one victim to another may constitute an assault on all victims. *State v. Kinner*, 701 S.W.2d 224, 226–27 (Tenn.Crim.App.1985). The Complaint alleges that Scott and Ervin pointed their weapons at Plaintiffs outside of the control room. Therefore, all Plaintiffs have sufficiently alleged facts constituting assault, and Defendants' motion to dismiss such claim is denied.

■ Defendants do not address Plaintiffs other state-law claims. Instead, Defendants contend that the Court should not exercise supplemental jurisdiction in this case. Underlying Defendants' argument, however, is the assumption that Plaintiffs' federal claims have no merit. This as-

sumption is in error, as the Court has found that Plaintiffs alleged sufficient facts to support an unlawful seizure claim.

A district court may exercise supplemental jurisdiction over state-law claims if the state and federal claims derive from a common nucleus of operative fact, and the claims are such that the plaintiff would ordinarily be expected to try them in one judicial proceeding. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966); *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir.1991). Supplemental jurisdiction is a doctrine of discretion, and its justification lies in considerations of judicial economy, and convenience and fairness to litigants. *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139. In the present case, Plaintiffs' claims arise from the same nucleus of facts. Additionally, although Plaintiffs' federal and state claims have different substantive requirements, the facts necessary to prove each claim are similar. For example, to show the nature and quality of the intrusion on Plaintiffs' Fourth Amendment rights, Plaintiffs must develop the facts surrounding the seizure, which involve Scott's and Ervin's alleged use of their handguns. To show an assault, or intentional infliction of emotional distress, Plaintiffs must rely on the same facts. Therefore, judicial economy favors Plaintiffs trying this case in one judicial proceeding. Accordingly, the Court **DENIES** Defendants' motion to dismiss Plaintiffs' state-law claims, and will exercise its supplemental jurisdiction in this case.

### C. Other issues

Defendants contend that Plaintiffs only sued Defendants in their official capacity, and that under *Hafer v. Melo*, 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991), the suit is actually one against Shelby County. Defendants therefore reason that all individually named Defendants should be dismissed from the complaint. Defendants, however, misconstrue *Hafer*. In *Hafer*, the petitioner, Barbara Hafer, claimed that, because she was sued for actions flowing from her position as auditor general of Pennsylvania, she could only be sued in her official capacity. The Supreme Court held that Hafer's position was not supported by its prior decisions and was an unpersuasive interpretation of § 1983. *Hafer*, 502 U.S. at 27, 112 S.Ct. at 363. The Court found that liability does not turn on whether or not a defendant was acting within his or her official capacity when injuring the plaintiff. Instead, § 1983 exposes a defendant to personal liability whether or not that defendant was acting within the perimeters of his or her official duties. *Id.* at 28, 112 S.Ct. at 363. To establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right. *Id.* at 25, 112 S.Ct. at 362.

In the instant case, Plaintiffs allege that all Defendants had complicity in the events leading to the substance of the unlawful seizure claim. Plaintiffs' Complaint specifically sues each and every Defendant in their individual and official capacity. Under *Hafer* and the facts alleged, Plaintiffs may do so.

## IV. Conclusion

The Court **GRANTS** Defendants' motion to dismiss Plaintiffs' Fourteenth Amendment claim arising under § 1983. The Court **DENIES** Defendants' motion to dismiss Plaintiffs' remaining federal and state-law claims.