JOHN ASELTON, ADMINISTRATOR (ESTATE OF
BRIAN ASELTON) *v.* TOWN OF
EAST HARTFORD
(SC 17383)

Sullivan, C. J., and Borden, Norcott, Katz and Palmer, Js.

Argued October 17, 2005—officially released February 7, 2006

*David K. Jaffe*, with whom were *Sally A. Roberts* and, on the brief, *Jeffrey E. Potter*, for the appellant (plaintiff).

*Thomas R. Gerarde,* with whom was *Melinda A. Powell,* for the appellees (defendant James Shay et al.).

*Opinion*

KATZ, J. East Hartford police officer Brian Aselton (decedent) was fatally shot when he unexpectedly encountered a home robbery in progress after having been dispatched to respond to a 911 "check welfare" call. The issue in this appeal is whether the plaintiff, John Aselton, administrator of the decedent's estate, can state a claim for a violation of substantive due process under the state and federal constitutions against employees of the East Hartford police department who allegedly were responsible for dispatching the decedent to the scene with inadequate and misleading information. The plaintiff appeals from the judgment of the trial court rendering summary judgment in favor of the defendants, East Hartford police chief James Shay and East Hartford police dispatch employees Patricia Learned, William Madore and Deborah Rataic.[1] We affirm the trial court's judgment.

The record reflects the following facts, as read in the light most favorable to the plaintiff as the nonmoving party for summary judgment. On January 23, 1999, at approximately 9:13 p.m., Learned, an intake dispatcher with the East Hartford police department, had been engaged in a forty-five minute personal telephone call when a 911 telephone call came in from a complainant, Mark Myers. Learned put her personal call on hold,

___

[1] Also named as defendants were the town of East Hartford (town), John Doe No. 1, Alex Sostre, Nancy Forty, Erika Vilchel and Jose Gonzalez. Before discovery was initiated, the trial court dismissed the claims against the town. That ruling is not at issue in this appeal, and Sostre, Forty, Vilchel and Gonzalez are not parties to this appeal. Although the motion for summary judgment was granted as to the defendant John Doe 1 also, absent any identification as to this individual, references in this opinion to the defendants are to Shay, Learned, Madore and Rataic.

answered Myers' call and engaged in the following exchange with Myers, who seemed nervous:

"[Learned]: East Hartford Emergency.

"[Myers]: Yes, madam, 454 Main Street.

"[Learned]: Uh hum.

"[Myers]: Apartments—I just heard some loud noise, some groaning and yelling, I don't know what's going on—some loud noise from outside—maybe somebody fell down the stairs—there's somebody yelling and groaning—I don't know what's going on.

"[Learned]: What apartment are you in?

"[Myers]: I'm sorry—above Car Quest Auto Parts Store.

"[Learned]: What apartment are you in?

"[Myers]: I'm in [five]—nothing wrong here—but I heard some noise outside.

"[Learned]: Like where outside?

"[Myers]: It seems like in the apartment across— maybe some loud noise, somebody yelling, someone groaning—I have no idea what's going on here.

"[Learned]: So you're not sure exactly what happened and you haven't gone out to check?

"[Myers]: No I didn't look. I don't know what's going on.

"[Learned]: OK, well, we'll send somebody out.

"[Myers]: OK.

"[Learned]: Bye."

While taking the call, which lasted approximately forty-five seconds, Learned typed the following information into the dispatch screen for transfer to radio

dispatch: "Says that he just heard a loud noise, someone yelling, doesn't really have any idea what it was and will not go look. It was outside." Learned thought that someone might have been injured, but did not include any such reference on the dispatch screen, and instead classified the call as a routine "check welfare" complaint, but coded the priority of the call as "H," meaning highest priority. Learned then returned to the personal call that she had put on hold. At approximately 9:14 p.m., Rataic, who was working as a dispatch trainee under the supervision of Madore, received the dispatch entry and issued a communication to the decedent and a second police officer, essentially restating the information that Learned had typed into the dispatch intake screen.[2] Moments later, because she had omitted any reference to the location of the noise, Rataic issued a second communication, pursuant to instructions by Madore, stating: "Be advised that was outside of Car Quest Auto Parts."

At approximately 9:16 p.m., the decedent and fellow police officer Mike Weglarz independently arrived on the scene, checked outside 454 Main Street in East Hartford near Car Quest Auto Parts and found no disturbance. The decedent then contacted the dispatcher, asking whether Myers wished to be seen. Rataic asked out loud whether Myers wanted to be seen, but Learned, who still was engaged in a personal call, did not answer. Madore then instructed Rataic that a complainant prob-

---

[2] Rataic issued the following communication: "On a check welfare at 454 Main Street, Apartment 5—454 Main Street, Apartment 5, complainant Mark Ryers reports he heard a loud noise and someone yelling. He has no idea what it's about and is not willing to go look." It appears that Rataic mistakenly referred to Myers as Ryers because his named was misspelled in the 911 telephone monitor. Although it is not entirely clear from the record what the "check welfare" classification specifically indicates, police officers interviewed as part of an investigation into the circumstances leading to the decedent's death inferred from the substance of the dispatch that it was a noise complaint.

ably could provide the responding officers with better information if the police officers saw him. Rataic also assumed, absent a contrary indication, that the inclusion of Myers' name and address on the display screen indicated that he wanted to be seen by the police. She therefore provided the decedent with Myers' location and stated, "he said he'll be seen." The decedent then entered the apartment building at 454 Main Street and walked up to the second floor hallway, where he encountered the defendant Alex Sostre, who with three other persons was in the process of committing, inter alia, a robbery and assault in apartment two. See footnote 1 of this opinion. Sostre then fatally shot the decedent in the head.[3] At approximately 9:22 p.m., police officers in the immediate area were informed that dispatch had received a telephone call from an individual reporting that a police officer was down in the hallway of the building. The responding officers entered the building and found the decedent lying in the hallway, with his weapon still secured in its holster. In apartment two, in close proximity to the decedent's body, the officers found Gregorio Velez bound, gagged and bleeding.

Thereafter, internal and independent investigations were conducted into the circumstances leading to the decedent's death. Shay attempted to pressure an internal affairs investigator into issuing a report that mirrored a preliminary internal report concluding that the 911 call had not been mishandled; however, a report based on a subsequent independent investigation into the incident concluded that, "it is highly likely that the response of the officers that evening would have been different had they had the same pertinent information received by . . . Learned," meaning that the decedent

[3] Our opinion in State v. Sostre, 261 Conn. 111, 115–18, 802 A.2d 754 (2002), sets forth in some detail the events underlying this action and the criminal charges filed by the state against Sostre.

would not have entered the building without having another officer present. The report further concluded that "[a] lack of supervision, policies and procedures . . . and [a] lack of ongoing training has significantly affected the performance of the communications division." Shay had notice of these problems by virtue of a complaint from a supervisor in the dispatch department, five years before the incident at issue, that conditions in the communications division were so bad that Shay was "going to lose a guy." Moreover, prior to January 23, 1999, another dispatcher had complained to a department supervisor that Learned was being distracted from her work by personal telephone calls.

The plaintiff subsequently commenced this action against the defendants; see footnote 1 of this opinion; seeking compensatory and punitive damages. The complaint alleged: common-law claims of negligent, reckless and wilful misconduct; violations under article first, §§ 4, 7, 8, 9, 10 and 14 of the Connecticut constitution; and violations under the first, fourth, sixth and fourteenth amendments to the United States constitution, pursuant to 42 U.S.C. § 1983. The defendants thereafter moved for summary judgment on all the claims, and the trial court granted the motion. In its memorandum of decision, the trial court first noted that the plaintiff had conceded, apparently at oral argument, that the exclusivity provision of the Workers' Compensation Act, General Statutes § 31-284 (a), barred the defendants' liability for the common-law negligence and recklessness counts. With respect to the claims for wilful misconduct, the court concluded that there was no evidence from which a reasonable person could conclude that any of the defendants had acted with the intent to expose the decedent to deadly force. The trial court also rejected the plaintiff's claims for common-law damages directly under the Connecticut constitution, concluding that such claims were barred by virtue of the Workers'

Compensation Act in that the legislature intended that the act provide the exclusive remedy for a work-related death.

Finally, the court turned to the plaintiff's federal constitutional claims, first noting that the plaintiff had abandoned all such claims except those alleging a violation of substantive due process. It then determined that the standard set forth by the United States Supreme Court for establishing such a violation is whether the defendants' conduct "shock[s] the conscience." In concluding that the plaintiff could not meet this standard, the court reasoned: "[T]here is no genuine factual dispute that the [defendants] never harbored an intent that [the decedent] be injured when he was dispatched to respond to the emergency call. Neither does unwittingly dispatching an officer to a place where he unexpectedly encounters an armed burglar, willing to kill him, shock the conscience. Negligence, recklessness, and even callous indifference by police personnel who dispatched [the decedent] that night are insufficient to create a substantive due process violation . . . ." Accordingly, the trial court rendered summary judgment for the defendants.

The plaintiff moved for reconsideration of the judgment, claiming, inter alia, that the trial court had failed to consider: (1) the theory of "state created danger" as a basis for liability for a substantive due process violation under the federal constitution, because the defendants' conduct had increased the risk of harm to the decedent; and (2) his claim against Shay on the basis of supervisory liability. The trial court denied the motion for reconsideration, and this appeal followed.[4]

On appeal, the plaintiff challenges the trial court's judgment only with respect to the substantive due pro-

---

[4] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we thereafter transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

cess claims under both the federal and state constitutions. With respect to the claims under the federal constitution, the plaintiff contends that the trial court failed to recognize state created danger as a basis for liability. Specifically, the plaintiff claims that, as a result of its failure to consider this theory, the trial court improperly required him to establish an intent to harm, rather than the lesser state of mind of deliberate indifference to harm. The plaintiff also claims that the trial court improperly granted the motion for summary judgment on the claim against Shay for supervisory liability because the court altogether failed to address that claim, which was supported sufficiently by the evidence. With respect to the claims under the Connecticut constitution, the plaintiff contends that summary judgment was improper because article first, § 8, of the Connecticut constitution affords even greater protection than its federal counterpart, and the workers' compensation scheme does not preclude relief because that scheme was not intended to compensate workers for a deprivation of constitutional rights.

The defendants respond that the trial court properly rendered summary judgment on the federal due process claims because: (1) it is questionable whether the theory of state created danger remains viable after recent United States Supreme Court decisions requiring conscience shocking conduct, but to the extent that it survives, it does not apply in the law enforcement context; (2) intentional conscience shocking conduct is the proper standard for establishing a violation under the facts of this case; and (3) the trial court did not need to address the supervisory liability claim against Shay because the plaintiff had failed to establish the necessary predicate of an underlying constitutional violation. With regard to the due process claims under the Connecticut constitution, the defendants contend that we need not consider these claims because the plaintiff

has failed to demonstrate that our constitution provides more expansive protection than the federal constitution, under which the plaintiff's claims fail. Alternatively, the defendants contend that both our case law and the workers' compensation scheme counsel against recognizing a more expansive view of substantive due process under the Connecticut constitution. Finally, with respect to all of the claims, the defendants contend that, should we conclude that summary judgment improperly was rendered, they still would be entitled to prevail on the ground of qualified immunity. We conclude that the trial court properly granted the defendants' motion for summary judgment because, although we conclude that the plaintiff is entitled to proceed under the theory of state created danger, the defendants' conduct did not rise to the level required to establish a due process violation in this case as a matter of law.

Guiding our inquiry as to all of the claims is our well established standard of review of a trial court's decision granting a motion for summary judgment. "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . On appeal, we must determine whether the legal conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court." (Citation omitted; internal quotation marks omitted.) *Cogan* v. *Chase Manhattan Auto Financial Corp.*, 276 Conn. 1, 6–7, 882 A.2d 597 (2005). "Finally, the scope of our review of the trial court's decision to grant the [defendants'] motion for summary judgment is plenary." (Internal quotation marks omitted.) *Ace*

*Equipment Sales, Inc.* v. *Buccino*, 273 Conn. 217, 227, 869 A.2d 626 (2005).

## I

We begin with the plaintiff's substantive due process claims under the federal constitution. These claims give rise to three issues. We first must consider whether the theory of state created danger is a viable basis upon which to state such a claim. If so, we must determine whether the requisite culpability for establishing liability is deliberate indifference or intent to harm. If the former, we must consider whether the evidence viewed in the light most favorable to the plaintiff can establish such culpability.

The plaintiff's federal constitutional claims rest on the due process clause of the fourteenth amendment.[5] "The most familiar office of that Clause is to provide a guarantee of fair procedure in connection with any deprivation of life, liberty, or property by a State. [The plaintiff], however, does not advance a procedural due process claim in this case. Instead, [he] relies on the substantive component of the Clause that protects individual liberty against certain government actions regardless of the fairness of the procedures used to implement them." (Internal quotation marks omitted.) *Collins* v. *Harker Heights*, 503 U.S. 115, 125, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992). The parameters applicable to the plaintiff's substantive due process claims largely have been established by three United States Supreme Court decisions. Accordingly, we begin with a discussion of those cases.

## A

The state created danger theory on which the plaintiff relies has its genesis in *DeShaney* v. *Winnebago County*

---

[5] The federal due process clause provides in relevant part: "[N]or shall any State deprive any person of life, liberty or property, without due process of law . . . ." U.S. Const., amend. XIV, § 1.

*Dept. of Social Services*, 489 U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989) (*DeShaney* v. *Winnebago County*). In that case, a father had beaten his four year old son, Joshua DeShaney, causing such severe brain damage that he was expected to spend the rest of his life confined to an institution for the profoundly retarded. Id., 193. The petitioners, Joshua and his mother, brought a § 1983 action against the social workers and other local officials who, despite having received credible complaints over a two year period of Joshua's abuse by his father, nonetheless failed to remove Joshua from his father's custody. Id., 191–93. The petitioners alleged that the respondents' failure to protect Joshua from a risk of violence by his father that they knew or should have known about violated Joshua's right to substantive due process. Id., 193.

The *DeShaney* court acknowledged the "undeniably tragic" facts of the case; id., 191; but rejected the petitioners' contention that the respondents' failure to discharge their duty to protect Joshua was an abuse of governmental power that so "shocks the conscience," a standard first articulated by the court in *Rochin* v. *California*, 342 U.S. 165, 172, 72 S. Ct. 205, 96 L. Ed. 183 (1952), as to violate substantive due process. *DeShaney* v. *Winnebago County*, supra, 489 U.S. 197–98. The court reasoned that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that

those interests do not come to harm through other means."[6] Id., 195.

The court rejected the petitioners' position that the case fell within a limited class of "special relationship" cases wherein the court had recognized an affirmative duty to protect. Id., 197–98. It noted that the duty arose in those cases because the person requiring aid was in the custody of the government, such as a prison inmate or an institutionalized person. Id., 199–200. Of particular relevance to this case, the court then went on to explain: "[The] [p]etitioners concede that the harms Joshua suffered occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor. While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them. That the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Under these circumstances, the State had no constitutional duty to protect Joshua." Id., 201.

---

[6] The United States Supreme Court previously had considered the issue of governmental liability for third party actions in *Martinez* v. *California*, 444 U.S. 277, 100 S. Ct. 553, 62 L. Ed. 2d 481 (1980). In *Martinez*, the court held that the murder of a fifteen year old girl by a parolee five months after his release from prison did not subject the state parole board to liability under § 1983. Id., 280–81, 285. The court concluded that the actions of the state did not deprive the victim of a constitutionally protected right. Id., 285. The court reasoned that the parolee was not an agent of the state, the parole board did not know that the decedent, as distinguished from the public at large, faced any special danger, and the death was too remote a consequence of the parole board's action to hold them responsible under the federal civil rights law. Id.

Thereafter, almost every federal Circuit Court of Appeals, including the Second Circuit, interpreted *DeShaney* and the cases cited therein as recognizing two "exceptions" to the general rule precluding liability for the government's failure to protect against harm from a private actor: The first is a special relationship wherein the victim typically is in the care or custody of the government;[7] and the second is a "state created danger" wherein the state affirmatively creates or increases the victim's risk of danger at the hands of a private actor.[8] Two United States Supreme Court deci-

[7] Most courts have construed the special relationship exception narrowly to require that the government actually have taken custody of, or imposed restraint on, the victim. See, e.g., *Sargi* v. *Board of Education*, 70 F.3d 907, 910–11 (6th Cir. 1995) ("[a] special relationship can only arise when the state restrains an individual"); *Pinder* v. *Johnson*, 54 F.3d 1169, 1175 (4th Cir.) ("[t]his Court has consistently read *DeShaney* to require a custodial context before any affirmative duty can arise under the Due Process Clause"), cert. denied, 516 U.S. 994, 116 S. Ct. 530, 133 L. Ed. 2d 436 (1995). A few cases have suggested that, under certain facts, a more expansive view of the exception may apply. See, e.g., *James* v. *Meow Media, Inc.*, 300 F.3d 683, 694 (6th Cir. 2002) ("This duty to protect can be triggered by placing the putative plaintiff in custody or by taking other affirmative steps that disable the plaintiff from protecting himself against third-party intentional criminal acts. Of course, a special relationship can be created by a contract between the plaintiff and the defendant."), cert. denied, 537 U.S. 1159, 123 S. Ct. 967, 154 L. Ed. 2d 893 (2003); see also *DeShaney* v. *Winnebago County*, supra, 489 U.S. 201 n.9 (raising issue but expressing no view on whether government's placement of child in foster home would present "a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect"). In the present case, the plaintiff does not allege that the decedent was dependent to such a degree on the information he received from the dispatchers that these circumstances gave rise to a special relationship imposing a duty to protect him, and we, therefore, express no view as to the merits of such a claim.

[8] In the following cases, the circuit courts indicated that they had recognized both the special relationship and state created danger theories following *DeShaney*: *Velez-Diaz* v. *Vega-Irizarry*, 421 F.3d 71, 80 (1st Cir. 2005); *Schroder* v. *Fort Thomas*, 412 F.3d 724, 727 (6th Cir. 2005); *Moore* v. *Briggs*, 381 F.3d 771, 773 (8th Cir. 2004); *Brown* v. *Dept. of Health Emergency Medical Services Training Institute*, 318 F.3d 473, 478–79 (3d Cir. 2003); *Gonzales* v. *Castle Rock*, 307 F.3d 1258, 1262 (10th Cir. 2002), rev'd on other grounds, 545 U.S. 748, 125 S. Ct. 2796, 162 L. Ed. 2d 658 (2005); *Monfils* v. *Taylor*, 165 F.3d 511, 516 (7th Cir. 1998), cert. denied, 528 U.S. 810, 120 S.

sions subsequent to *DeShaney*, however, inform our inquiry as to whether the plaintiff may establish the defendants' liability under the theory of state created danger and, if so, under which standard of culpability.

In *Collins* v. *Harker Heights*, supra, 503 U.S. 117, the plaintiff, the widow of an employee of the city's sanitation department who had been asphyxiated after entering a manhole to unstop a sewer line, brought suit against the city alleging that it had a custom and policy of deliberate indifference toward the safety of its employees. Specifically, the plaintiff alleged that the city had a custom and policy of failing to train its employees about the dangers of such work and to provide safety equipment and safety warnings, and that this conduct reflected its intentional and systematic disregard of such requirements under state law. Id., 117–18. The plaintiff further alleged that an accident similar to the one that caused her husband's death had put the city on notice of the risks to which he had been exposed. Id.

A unanimous Supreme Court affirmed the judgment of the Fifth Circuit Court of Appeals affirming the District Court's judgment dismissing the action on the ground that the plaintiff had failed to allege a constitutional violation. Id., 117–18, 125. In doing so, the court

Ct. 43, 145 L. Ed. 2d 39 (1999); *Huffman* v. *Los Angeles*, 147 F.3d 1054, 1058 (9th Cir. 1998); *Ying Jing Gan* v. *New York*, 996 F.2d 522, 533 (2d Cir. 1993); *Cornelius* v. *Highland Lake*, 880 F.2d 348, 352–54 (11th Cir. 1989), cert. denied sub nom. *Spears* v. *Cornelius*, 494 U.S. 1066, 110 S. Ct. 1784, 108 L. Ed. 2d 785 (1990), overruled by *White* v. *Lemacks*, 183 F.3d 1253 (11th Cir. 1999). The Fifth and Fourth Circuits have recognized the special relationship exception, but generally have not recognized the state created danger exception. See *Beltran* v. *El Paso*, 367 F.3d 299, 307 (5th Cir. 2004) (noting that "[t]his court has consistently refused to recognize a 'state-created danger' theory of § 1983 liability"); *Pinder* v. *Johnson*, 54 F.3d 1169, 1175–76 (4th Cir.) (recognizing both theories but questioning characterization of special danger as second exception created by *DeShaney*, rather than alternative framework under § 1983 for direct injury), cert. denied, 516 U.S. 994, 116 S. Ct. 530, 133 L. Ed. 2d 436 (1995).

first noted the cautionary approach it would undertake in considering such a claim: "As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended. . . . The doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." (Citation omitted.) Id., 125.

The court then noted that "[a] fair reading of [the plaintiff's] complaint does not charge the city with a wilful violation of [her decedent husband's] rights. [The plaintiff] does not claim that the city or any of its agents deliberately harmed her husband. In fact, she does not even allege that his supervisor instructed him to go into the sewer when the supervisor knew or should have known that there was a significant risk that he would be injured. Instead, she makes the more general allegation that the city deprived him of life and liberty by failing to provide a reasonably safe work environment. Fairly analyzed, her claim advances two theories: that the Federal Constitution imposes a duty on the city to provide its employees with minimal levels of safety and security in the workplace, or that the city's 'deliberate indifference' to [her husband's] safety was arbitrary government action that must 'shock the conscience' of federal judges." Id., 125–26.

The court rejected both theories. With respect to the first theory, the court noted that, "[n]either the text nor the history of the Due Process Clause supports [the plaintiff's] claim that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause." Id., 126. The court reiterated its admonition in *DeShaney* that the government cannot be held liable for failing to take affirmative action to protect individuals from harm from other sources. Id.

With respect to the plaintiff's second theory of liability, the court concluded that it was "not persuaded that the city's alleged failure to train its employees, or to warn them about known risks of harm, was an omission that can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense. [The plaintiff's] claim is analogous to a fairly typical state-law tort claim: The city breached its duty of care to her husband by failing to provide a safe work environment. Because the Due Process Clause does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society . . . we have previously rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law, see, e.g., [*Daniels* v. *Williams*, 474 U.S. 327, 332–33, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)]; *Baker* v. *McCollan*, 443 U.S. 137, 146 [99 S. Ct. 2689, 61 L. Ed. 2d 433] (1979); *Paul* v. *Davis*, 424 U.S. 693, 701 [96 S. Ct. 1155, 47 L. Ed. 2d 405] (1976). The reasoning in those cases applies with special force to claims asserted against public employers because state law, rather than the Federal Constitution, generally governs the substance of the employment relationship." (Citation omitted; internal quotation marks omitted.) *Collins* v. *Harker Heights*, supra, 503 U.S. 128. The court refused to characterize the defendant city's conduct as conscience shocking because the city's actions necessarily were predicated on policy choices as to personnel and allocation of resources, which the court presumed had been made rationally. Id., 128–29. It also noted, however, that the fact that the claim arose in the context of a public employment relationship in and of itself would not be of controlling significance when other facts demonstrated a constitutional violation. Id., 119.

Six years after its decision in *Collins*, the Supreme Court had an opportunity to expound on the state of

mind necessary to establish conduct that, in a constitutional sense, shocks the conscience. See *Sacramento* v. *Lewis*, 523 U.S. 833, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998). In *Lewis*, the issue before the court was "whether a police officer violates the Fourteenth Amendment's guarantee of substantive due process by causing death through deliberate or reckless indifference to life in a high-speed automobile chase aimed at apprehending a suspected offender." Id., 836. The court concluded that this conduct did not violate due process and that "in such circumstances only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." Id.

In reaching that conclusion, the court first underscored that its prior decisions on this issue "repeatedly [had] emphasized that only the most egregious conduct can be said to be arbitrary in the constitutional sense . . . ." Id., 846. Accordingly, conduct intending to injure without legitimate justification would be the type of arbitrary governmental action that would most clearly meet the "shocks the conscience" standard. Id., 849. The court posited, however, that, "[w]hether the point of the conscience shocking is reached when injuries are produced with culpability falling within the middle range, following from something more than negligence but less than intentional conduct, such as recklessness or gross negligence . . . is a matter for closer calls." (Citation omitted; internal quotation marks omitted.) Id. The court noted that it previously had determined that a cognizable claim could be stated under the standard of "deliberate indifference" in the context of a denial of medical needs when a person is under the care and custody of the government and thereby deprived of the opportunity to provide for his or her own needs. Id., 849–51.

Therefore, the court cautioned that the degree of culpability required to demonstrate conscience shocking conduct depended on the facts of the case. Id., 850–51. When the facts demonstrate that there is no opportunity for reflection and deliberation, such as decision-making by police officers in responding to a prison riot or a high speed pursuit, a standard of deliberate indifference cannot be applied sensibly. Id., 851–52. In such settings, "a deliberate indifference standard does not adequately capture the importance of . . . competing obligations, or convey the appropriate hesitancy to critique in hindsight decisions necessarily made in haste, under pressure, and frequently without the luxury of a second chance." (Internal quotation marks omitted.) Id., 852. Accordingly, the court concluded that in such circumstances, liability should turn on whether the police acted with the intent to cause harm. Id., 853. With the parameters set by *DeShaney*, *Collins* and *Lewis* in mind, we now address the plaintiff's substantive due process claims.

## B

Each party asserts a different view of the impact of *Collins* and *Lewis* on the plaintiff's claims. The plaintiff asserts that, contrary to the trial court's decision, the defendants may be held liable under the state created danger theory, and that, under the reasoning of *Lewis*, deliberate indifference, and not intent to harm, is the requisite state of mind to be applied in this case. Specifically, the plaintiff contends that, because the evidence reflects that the defendants had time to deliberate before the decedent entered the building where he confronted Sostre, according to *Lewis*, a standard of deliberate indifference sensibly can be applied. The plaintiff points to the fact that approximately nine minutes lapsed between the time Myers called and the police were notified that an officer was down in the building, and he asserts that Learned had plenty of time to probe

Myers for details and clarification as to the location and nature of the incident, or thereafter to provide additional information to the decedent.[9] The plaintiff distinguishes his claim from *Collins* and characterizes that case as standing only for the proposition that a claim asserting a general right to a safe workplace is not constitutionally cognizable, specifically when the claim implicates political decisions about personnel and the allocation of resources. He asserts that *Collins* is relevant only to the extent that it underscores the point that whether the injury arose in the course of a public employment relationship is not dispositive.

In response, the defendants first contend that the plaintiff cannot proceed under the theory of state created danger because courts either have rejected the theory altogether as superseded by *Collins* and *Lewis* or have expressed reluctance to apply the theory to law enforcement officials. The defendants next assert that, even if the theory is viable, *Collins* and *Lewis* require that the plaintiff prove intent to harm, not deliberate indifference, and, accordingly, his claims must fail. They claim that this case squarely fits within the facts of *Collins*, wherein the court rejected similar claims of culpability. They also claim that, under *Lewis*, intent to harm is the requisite state of mind by virtue of the nature of emergency dispatch work, which, by necessity, precludes true deliberation. They point to the one minute and forty-five second period between Myers' call and the dispatch to the police officers.

We agree with the plaintiff that the state created danger theory controls this case and that the proper state of mind is deliberate indifference. We nevertheless

---

[9] In support of this contention, the plaintiff submitted transcripts of other 911 calls taken by Learned in which, when she was not distracted by a personal telephone call on hold, as in the present case, she spent considerably more time on the emergency calls and asked more probing questions to clarify the circumstances prompting the calls.

agree with the defendants that the plaintiff cannot prevail under the facts of this case.

As an initial matter, we disagree with the plaintiff's characterization of the trial court's decision in one significant respect. We disagree that the trial court failed to consider the state created danger theory. It is axiomatic that the due process clause is a limitation on *government* action, designed to prevent it "from abusing [its] power, or employing it as an instrument of oppression . . . ." (Internal quotation marks omitted.) *DeShaney* v. *Winnebago County*, supra, 489 U.S. 196. As our discussion of *DeShaney* and its progeny illustrates, because Sostre, a private actor, inflicted the decedent's fatal wound, the plaintiff would be able to prevail *only* if he could attribute that harm to the government, by showing either that the state had a special relationship to the decedent and thereby assumed an obligation to protect him from harm, or that the state created or increased the decedent's risk of harm at the hands of Sostre. Without meeting that threshold requirement, the plaintiff could not prevail irrespective of the defendants' state of mind or degree of culpability. Therefore, by virtue of the fact that the trial court analyzed whether the defendants' level of culpability met the *Lewis* conscience shocking standard, we presume that it implicitly must have determined, or at least assumed for purposes of its analysis, that the plaintiff could attribute the harm to the government defendants by virtue of the state created danger theory. Thus, properly framed, the plaintiff's claim on appeal is that he is entitled to prevail under that theory by establishing a less culpable state of mind than intent to harm, namely, deliberate indifference.

The defendants, however, contend that the state created danger theory cannot be applied, and, therefore, we begin by considering whether the plaintiff can meet the threshold requirement of attributing the harm to

the government under that theory. Following *Collins* and *Lewis*, many Circuit Courts of Appeal have reconsidered the state created danger theory. Most of those courts have continued to recognize the theory as a basis for liability, but have engrafted the "conscience shocking" standard as a further limitation to recovery when the facts otherwise demonstrate wilful or deliberate indifference to a risk of harm. See *Velez-Diaz* v. *Vega-Irizarry*, 421 F.3d 71, 80 (1st Cir. 2005) ("[m]ost of the circuit courts have now acknowledged that the existence of a constitutional violation is possible, on particular facts, under a 'state created danger' theory of liability"); see also, e.g., *Christiansen* v. *Tulsa*, 332 F.3d 1270, 1281 (10th Cir. 2003) ("[t]o make out a proper danger creation claim, a plaintiff must demonstrate that [1] the charged state entity and the charged individual actors created the danger or increased [the] plaintiff's vulnerability to the danger in some way; [2] [the] plaintiff was a member of a limited and specifically definable group; [3] [the] defendants' conduct put [the] plaintiff at substantial risk of serious, immediate, and proximate harm; [4] the risk was obvious or known; [5] [the] defendants acted recklessly in conscience disregard of that risk; and [6] such conduct, when viewed in total, is conscience shocking" [internal quotation marks omitted]); *Schieber* v. *Philadelphia*, 320 F.3d 409, 417 (3d Cir. 2003) (adding requirement of showing conscience shocking conduct to existing test requiring: "[1] the harm ultimately caused was foreseeable and fairly direct; [2] the state actor acted in willful disregard for the safety of the plaintiff; [3] there existed some relationship between the state and the plaintiff; [and] [4] the state actors used their authority to create an opportunity that otherwise would not have existed for the third party's crime to occur").[10] Thus, we adopt the

---

[10] Although one Circuit Court of Appeals adopted the position advocated by the defendants in this case, concluding that the theory no longer was viable because it had been superseded by the "shocks the conscience" standard under *Collins* and *Lewis*; see *Waddell* v. *Hemerson*, 329 F.3d 1300,

majority view that the state created danger theory still is viable, but requires conduct that rises to the level of conscience shocking and evidences the requisite degree of culpability, either deliberate indifference to harm or intent to harm.[11]

The defendants suggest, however, that the state created danger theory is inapplicable to the specific context of the present case, namely, where a law enforcement official was injured in the course of his employment. It appears that only a few courts have considered claims of state created danger theory as applied to law enforcement officers, and in all of those cases, the courts have rejected the claims.[12] See *Walls*

1305 (11th Cir. 2003); we do not find that court's reasoning persuasive. Neither *Collins* nor *Lewis* rejected the theory as articulated in *DeShaney*, and those cases readily can be reconciled with *DeShaney*.

[11] We note that the circuit courts have not adopted a uniform test for determining whether a plaintiff prevails on a state created danger theory of liability. Compare, e.g., *Schroder* v. *Fort Thomas*, 412 F.3d 724, 728 (6th Cir. 2005); *Kennedy* v. *Ridgefield*, 411 F.3d 1134, 1142 (9th Cir. 2005); *Christiansen* v. *Tulsa*, supra, 332 F.3d 1281; *Schieber* v. *Philadelphia*, supra, 320 F.3d 416–17. We need not, in the present case, decide which test to adopt because, for the reasons discussed later in this opinion, the plaintiff cannot meet one factor that is common to all the tests—deliberate indifference.

[12] In only one of these cases did the court expressly reject the theory of state created danger as applied to law enforcement officials as a matter of law; see *Pahler* v. *Wilkes-Barre*, 207 F. Sup. 2d 341, 351 (M.D. Pa. 2001), aff'd, 31 Fed. Appx. 69, 71, 2002 U.S. App. LEXIS 4124 (3d Cir. March 12, 2002); relying on the reasoning of the other district court decisions as support for such a conclusion. Id. Notably, on appeal, the Third Circuit declined to decide whether this conclusion was correct, affirming on an alternative ground, and thus clearly left open the question of whether that circuit would preclude such claims as a matter of law. See *Pahler* v. *Wilkes-Barre*, supra, 31 Fed. Appx. 71 ("we need not decide whether the 'state created danger' theory applies to a police officer"). We note that subsequent to the Sixth Circuit's decision in *Walls* v. *Detroit*, United States Court of Appeals, Docket No. 92-1846, 1993 WL 158498, *5 (6th Cir. May 14, 1993), wherein the court rejected a claim by a law enforcement officer asserting a claim for state created danger, that court subsequently permitted a claim on the basis of an increased danger to the officer, but did so under circumstances that did not implicate the assumed dangers rationale discussed in *Walls*. See *Kallstrom* v. *Columbus*, 136 F.3d 1055, 1064 (6th Cir. 1998) (addressing whether undercover police officers could state constitutional claim for disclosure of personal information in their personnel files).

v. *Detroit,* United States Court of Appeals, Docket No.
92-1846, 1993 WL 158498, *5 (6th Cir. May 14, 1993);
*Pahler* v. *Wilkes-Barre,* 207 F. Sup. 2d 341, 351 (M.D.
Pa. 2001), aff'd, 31 Fed. Appx. 69, 71, 2002 U.S. App.
LEXIS 4124 (3d Cir. March 12, 2002); *Rutherford* v.
*Newport News,* 919 F. Sup. 885 (E.D. Va. 1996), aff'd,
United States Court of Appeals, Docket No. 96-1535,
1997 U.S. App. LEXIS 3502 (4th Cir. February 27, 1997)
(per curiam); *Hartman* v. *Bachert,* 880 F. Sup. 342 (E.D.
Pa. 1995); see also *Jensen* v. *Oxnard,* 145 F.3d 1078,
1084 (9th Cir. 1998) (distinguishing preceding cases
from claim wherein law enforcement officer was shot
fatally by fellow officer during raid on ground that claim
alleged excessive force under fourth amendment rather
than due process clause and concluding "the difference
is quite significant"). These courts have viewed the con-
science shocking standard mindful that law enforce-
ment duties necessarily entail exposure to dangerous,
and even deadly, situations. They further have reasoned
that the government cannot be held liable merely for
exposing a law enforcement official to a danger that
the officer knowingly and voluntarily assumed as part
of his or her duties. See, e.g., *Walls* v. *Detroit,* supra,
**5-6 (The court rejected a claim by the executor of
the estate of a police officer who was fatally shot after
being ordered to enter a building and arrest a barricaded
gunman, reasoning: "[The] [p]laintiff's artful attempt
to recast his complaint in terms distinguishable from
[*Collins*] is unavailing, because it misunderstands one
of the central tenets of the Supreme Court's holding in
that case: the Constitution does not guarantee police
officers and other municipal employees a workplace
free of unreasonable risks of harm. . . . Nowhere does
[the] plaintiff's complaint allege that [the decedent] did
not understand or appreciate the risk involved in his
job. . . . Without more, the Constitution is not impli-
cated when the [city's] . . . [c]hief of [p]olice orders

officers to go in and arrest a barricaded gunman. Such a command decision does not rise to the level of conscience-shocking." [Citations omitted.]); *Pahler* v. *Wilkes-Barre*, supra, 351 ("[The plaintiff police officer] entered into [his] job voluntarily and fully aware of the substantial risks of harm faced on a daily basis. City policemen, unlike private citizens, are constantly faced with dangerous situations in which they risk possible injury."); *Hartman* v. *Bachert*, supra, 351 ("[The decedent] entered into his duties as a [d]eputy [s]heriff voluntarily and with knowledge of the possible dangers faced by law enforcement personnel. More than the sanitation worker in *Collins*, [the] decedent's job involved routine exposure to danger, and he was aware of the substantial risk of harm faced daily. . . . [T]he state did not force [the] appellant to become a [deputy sheriff], and the state has no constitutional obligation to protect him from the hazards inherent in that occupation." [Internal quotation marks omitted.]).

We decline herein to adopt the limitation suggested by the defendants for several reasons. First, we hesitate to deny a discrete class of individuals the right to assert a constitutional claim irrespective of the degree of egregiousness of the government's conduct. Under such an approach, a law enforcement official would be denied relief even if it could be proved that the government acted with actual intent to harm. Second, to the extent that the cases rejecting due process claims under the theory of state created danger in the context of law enforcement suggest a legitimate concern, namely, that the very nature of the work itself—sending police officers to respond to dangerous situations—could give rise to liability, such a concern can be addressed in determining whether the conduct shocks the conscience. See *Sacramento* v. *Lewis*, supra, 523 U.S. 849 ("conduct intended to injure in some way *unjustifiable by any government interest* is the sort of official action

most likely to rise to the conscience-shocking level"
[emphasis added]). Finally, we decline to embrace a
standard that at best tolerates and at worst encourages
wanton and reckless behavior toward the safety of our
law enforcement officials.

In light of our conclusion that the plaintiff may pro-
ceed under the theory of state created danger, we turn
to the question of the requisite level of culpability. The
few courts to have considered substantive due process
claims involving 911 calls have applied the deliberate
indifference standard, rather than intent to harm. See
*Beltran* v. *El Paso*, 367 F.3d 299, 307 (5th Cir. 2004)
(applying deliberate indifference standard to claim
against 911 operator); *Schieber* v. *Philadelphia*, supra,
320 F.3d 417–19 (applying deliberate indifference stan-
dard to claim against officers responding to 911 call).
Applying that standard is consistent with *Collins* in that
the case clearly left open the possibility that deliberate
indifference could establish liability in a claim arising
in the workplace. See *Collins* v. *Harker Heights*, supra,
503 U.S. 125 (The court noted that "[the plaintiff's]
complaint does not charge the city with a willful viola-
tion of [her decedent husband's] rights. [The plaintiff]
does not claim that the city or any of its agents deliber-
ately harmed her husband. *In fact, she does not even
allege that his supervisor . . . knew or should have
known that there was a significant risk that he would
be injured.*" [Emphasis added.]).[13] Although *Lewis*

---

[13] We, therefore, reject the defendants' contention that claims by public
employees are barred absent a showing of an intent to harm. See also, e.g.,
*Uhlrig* v. *Harder*, 64 F.3d 567, 576–77 (10th Cir. 1995) (applying standard
of reckless conduct in conscience disregard of substantial risk of harm to
claim by therapist employed at state hospital, but concluding plaintiff could
not meet that standard); *L.W.* v. *Grubbs*, 974 F.2d 119, 122–23 (9th Cir.
1992) ("Under *Collins*, we cannot dismiss [the plaintiff's] claim against [the]
[d]efendants merely because she was an employee supervised by them. . . .
[The plaintiff] has alleged facts demonstrating official deliberate indifference
in creating the danger." [Citation omitted.]), on appeal after remand, 92 F.3d
894 (9th Cir. 1996); *Arnold* v. *Minner*, United States District Court, Docket
No. 04-1346JJF, 2005 WL 1501514 (D. Del. June 24, 2005) (concluding that

counsels that the requisite state of mind must consider the defendants' ability to deliberate before acting, and the present facts fall closer on the scale to the police pursuit (intent to harm) cases than the prison medical needs (deliberate indifference) cases, we are not convinced, especially in light of the evidence submitted by the plaintiff; see footnote 9 of this opinion; that the circumstances rose to the instinctive, reflexive conduct requiring a showing of intent to harm as discussed in *Lewis*. Accordingly, we conclude that the plaintiff must demonstrate that the defendants' conduct rose to the level of deliberate indifference. See *Pahler* v. *Wilkes-Barre*, supra, 31 Fed. Appx. 71 (recognizing potential liability under state created danger theory in law enforcement context and applying deliberate indifference, rather than intent to harm, standard).

The meaning of deliberate indifference, in the context of state created danger, post *Collins* and *Lewis*, sets forth a stringent standard. It has been described as "equivalent to the concept of recklessness utilized in the criminal [context] . . . [requiring] that the [actor] have an actual, subjective appreciation of an excessive risk of serious harm to [the victim's] health or safety and that [the actor] 'consciously disregard[ed]' that risk." [Citation omitted.] *Schieber* v. *Philadelphia*, supra, 320 F.3d 421; accord *Kennedy* v. *Ridgefield*, 411 F.3d 1134, 1143 (9th Cir. 2005) ("[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions" [internal quotation marks omitted]); *Beltran* v. *El Paso*, supra, 367 F.3d 307 ("[d]eliberate indifference requires that the state actor both knew of and disregarded an excessive risk to the victim's health and safety"); *Phelps* v. *Kapnolas*, 308 F.3d 180, 185–86 (2d

plaintiff, who was employee of state department of correction, had stated viable claim under state created danger theory and citing wilful disregard standard of culpability).

Cir. 2002) (same); *Sutton* v. *Utah State School for the Deaf & Blind*, 173 F.3d 1226, 1238 (10th Cir. 1999) ("[The] plaintiff-appellant's § 1983 claim must rest on a showing of reckless conduct on the part of [the defendant]. We have said that an 'act is reckless when it reflects a wanton or obdurate disregard or complete indifference to risk,' and that reckless intent is established if the state 'actor was aware of a known or obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences.' "). Thus, the defendants cannot be held liable for merely appreciating a possibility of a risk of harm; they must have consciously disregarded that risk. *Schieber* v. *Philadelphia*, supra, 417.

Viewing the evidence in the present case in the light most favorable to the plaintiff, as we must; *Cogan* v. *Chase Manhattan Auto Financial Corp.*, supra, 276 Conn. 6; we begin with the claim as to Learned. The evidence suggests that Learned was distracted with a personal telephone call on hold and, as a result, she failed to ask or to appreciate the need to ask Myers a fundamental and obvious question, namely, clarification as to the location from which the noise came that Myers heard when he stated "outside," "down the stairs" and "in the apartment across the . . . ." The latter statement referred, as Myers later explained to investigators, outside his apartment, either across or down the hallway. Learned then compounded her error by deciding to omit from her dispatch entry any reference to the possibility: (1) that the noise came from inside the building; and (2) that someone might be injured, based on Myers' comments that he heard yelling and groaning and thought that perhaps someone had fallen down the stairs. Moreover, Learned inaccurately conveyed the information that Myers actually had given

in that she indicated that he *would* not look outside, instead of that he *had* not looked outside.

Although we can surmise from these facts that Learned recognized the *possibility* that someone may have been injured, she neither knew that someone in fact had been injured, nor did she know the source of that injury. Accordingly, we cannot impute to her the knowledge and, therefore, the conscious disregard of facts that we have learned in hindsight: that someone was in fact injured; that the injury was caused by violent criminals, rather than by accident; that the armed criminals still were present at that location; and that, by dispatching police officers to that site without sufficient information or misinformation as to the facts, those officers were more likely to come in contact with one of those armed criminals. Cf. *Beltran* v. *El Paso*, supra, 367 F.3d 308 (no deliberate indifference by 911 operator when operator had no reason to know that caller's life was in imminent danger); *Stevens* v. *Trumbull County Sheriffs' Dept.*, 63 F. Sup. 2d 851, 854 (N.D. Ohio 1999) (no substantive due process claim regarding response to 911 call when victim did not indicate in her call that she was facing immediate risk of harm).

Similarly, the actions of Madore and Rataic do not indicate that they appreciated and disregarded a serious risk to the decedent's safety that night. Madore and Rataic merely relayed the facts that Learned had input into the dispatch screen, but never questioned Learned's coding of the call as high priority. To the extent that they erroneously informed the decedent that Myers wished to be seen, they were not aware of sufficient facts from which we can impute to them the knowledge that by doing so they would be directing the decedent toward a dangerous situation. Compare *Monfils* v. *Taylor*, 165 F.3d 511, 514–17 (7th Cir. 1998) (recognizing viable state created danger claim when police ignored decedent's request not to release tape

of his anonymous tip regarding coworker's criminal activity despite decedent's expressed fear of violent retaliation); *Wood* v. *Ostrander*, 879 F.2d 583, 588 (9th Cir. 1989) (recognizing claim for state created danger under deliberate indifference standard when police officer stranded female passenger of drunk driver in known high crime area by arresting driver and taking car keys and passenger thereafter was raped).

Finally, turning to the supervisory liability claim against Shay, "a supervisor may be found liable for his deliberate indifference to the rights of others by his failure to act on information indicating unconstitutional acts were occurring or for his gross negligence in failing to supervise his subordinates who commit such wrongful acts, provided that the plaintiff can show an affirmative causal link between the supervisor's inaction and [the] injury." *Poe* v. *Leonard*, 282 F.3d 123, 140 (2d Cir. 2002); accord *Hayut* v. *State University of New York*, 352 F.3d 733, 753 (2d Cir. 2003) (noting that claim requires supervisor's personal involvement in challenged conduct by direct participation or "official's [1] failure to take corrective action after learning of a subordinate's unlawful conduct, [2] creation of a policy or custom fostering the unlawful conduct, [3] gross negligence in supervising subordinates who commit unlawful acts, or [4] deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates"). Although there is a question of fact as to whether there is a causal link between Shay's failure to institute certain policies and procedures in the dispatch department and the misinformation conveyed to the decedent, our conclusion that the trial court properly rendered summary judgment as to the claims against Shay's subordinates, and thus that no constitutional violation occurred, precludes a claim of supervisory liability against Shay. Moreover, although *Collins* is not directly relevant

because it specifically addressed municipal liability, we note that the facts that the *Collins* court concluded were not sufficiently egregious evidenced a greater level of culpability than was present here. In *Collins*, the defendant city was on notice of the precise risk of harm by a strikingly similar prior accident involving the decedent's supervisor. See *Collins* v. *Harker Heights*, supra, 503 U.S. 118 n.1. Here, there is no evidence or allegations of prior injuries arising from the mishandling of 911 calls or even of prior incidents in which an actual risk had been created from the mishandling of calls and, therefore, no basis from which to conclude that Shay was deliberately indifferent to wrongful or unconstitutional conduct. See *Poe* v. *Leonard*, supra, 140, and cases cited therein. To the extent that Shay improperly may have attempted to influence the outcome of investigations into the events leading to the decedent's death, which would suggest that he thought that the police department had not handled the situation properly, Shay's post hoc recognition of his department's shortcomings also do not meet the requisite level of culpability.

We are mindful that the defendants' failure to provide the decedent with complete and accurate information impeded his ability to assess the incident effectively and to avoid the ambush awaiting him. The defendants' acts and omissions, however, do not meet the stringent standard set forth by the United States Supreme Court. Indeed, the nature of 911 dispatch work strongly counsels against imposing liability except where the conduct is extraordinarily egregious because the job routinely requires dispatching officers into dangerous and even potentially deadly situations. We do not intend to suggest that negligence, whether gross or minimal, should be tolerated when life and limb are at risk. Our law enforcement officials face great enough potential for harm at the hands of violent criminals without saddling

them with the additional risk that their coworkers' actions may impair the officers' ability to protect themselves from harm. Nonetheless, we must be mindful of *Lewis'* admonition that "only the most egregious official conduct can be said to be arbitrary in the constitutional sense . . . ." (Internal quotation marks omitted.) *Sacramento* v. *Lewis*, supra, 523 U.S. 846. The defendants' conduct cannot be deemed sufficient. Therefore, the trial court properly rendered summary judgment for the defendants on the substantive due process claims under the federal constitution.

## II

We next turn to the plaintiff's claims seeking common-law damages for substantive due process violations under article first, § 8, of the Connecticut constitution.[14] The plaintiff contends that the state constitution provides greater due process rights than its federal counterpart. In support of this contention, the plaintiff invokes arguments as to federalism and this court's inherent authority to construe the state constitution as providing more expansive rights than federal law. The defendants contend that we should not review this claim because the plaintiff has failed to demonstrate how the protections under the Connecticut constitution would be more expansive than under federal law. They further contend that, should we review the claim, the plaintiff nevertheless cannot prevail under our case law in which this court previously has declined to recognize a direct cause of action under article first, § 8. We conclude that the plaintiff has failed to satisfy the analytical framework necessary to establish independent rights under the state constitution. Accordingly, his claims must fail.

---

[14] The due process clause under article first, § 8, of the Connecticut constitution essentially mirrors the federal constitution and provides in relevant part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ."

As we previously have stated, the plaintiff "suggests that article first, § 8, of the Connecticut constitution provides even greater protection than its federal counterpart, but he fails to provide an adequate legal analysis of the basis of this claim. We decline to reach the defendant's state constitutional claim . . . because it was inadequately briefed pursuant to the standard this court enunciated in *State* v. *Geisler*, 222 Conn. 672, 610 A.2d 1225 (1992). As we concluded in *Geisler*, [i]n order to construe the contours of our state constitution and reach reasoned and principled results, the following tools of analysis should be considered to the extent applicable: (1) the textual approach . . . (2) holdings and dicta of this court . . . (3) federal precedent . . . (4) sister state decisions or sibling approach . . . (5) the historical approach, including the historical constitutional setting and the debates of the framers . . . and (6) economic/sociological considerations. . . . Id., 684–85. We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the [plaintiff] has provided an independent analysis under the particular provisions of the state constitution at issue. *State* v. *Robinson*, 227 Conn. 711, 721, 631 A.2d 288 (1993); see also *Luce* v. *United Technologies Corp.*, [247 Conn. 126, 142 n.22, 717 A.2d 747 (1998)]; *State* v. *Crespo*, 246 Conn. 665, 685 n.15, 718 A.2d 925 (1998) [cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999)], and cases cited therein." (Internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 384 n.15, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002); accord *Correia* v. *Rowland*, 263 Conn. 453, 469 n.15, 820 A.2d 1009 (2003) ("*Geisler* explicitly states tools that the bench and bar should use to construe the contours of our state constitution and reach reasoned and principled results" [internal quotation marks omitted]).

The plaintiff has not recognized, nor has he applied the six *Geisler* factors, with the exception of his discus-

sion of federal law under issue one and arguably applying prong two by addressing three decisions of this court bearing on this issue. Notably, although we did not refer expressly to the *Geisler* test in those decisions, our analysis in the two earlier cases cited by the plaintiff reflects extensive discussions beyond this court's case law to federal precedent, jurisprudence of our sister states and the historical approach to such claims. See *Binette* v. *Sabo*, 244 Conn. 23, 35–48, 710 A.2d 688 (1998); *Kelley Property Development, Inc.* v. *Lebanon*, 226 Conn. 314, 330–42, 627 A.2d 909 (1993). In the most recent case, *ATC Partnership* v. *Windham*, 251 Conn. 597, 741 A.2d 305 (1999), cert. denied, 530 U.S. 1214, 120 S. Ct. 2217, 147 L. Ed. 2d 249 (2000), we did not analyze the *Geisler* factors because we concluded that the plaintiff's claim was "indistinguishable from that which we found insufficient to warrant constitutional protection in *Kelley Property Development, Inc.*," and thus there was no need to engage in such analysis. *ATC Partnership* v. *Windham*, supra, 615.

Moreover, to the extent that the plaintiff has analyzed the issue, he has provided us with nothing more than a case that stands for the general proposition that we may recognize broader protections under the state constitution, cases in which we specifically declined to recognize more expansive due process rights under our constitution and arguments as to why the workers' compensation scheme would not *preclude* our recognition of such rights. Therefore, even if we were inclined to consider his claim, he has offered us no case law or other authoritative support weighing in favor of his proposition that we should recognize more expansive state constitutional rights than those afforded under the federal constitution. See *State* v. *Gibbs*, 254 Conn. 578, 599, 758 A.2d 327 (2000) (rejecting for similar reasons plaintiff's equal protection claim). Accordingly, the plaintiff's claim that the state constitution affords

greater substantive due process than the federal constitution is inadequately briefed to warrant further consideration.

The judgment is affirmed.

In this opinion the other justices concurred.